# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Patrick Engineering, Inc. v. City of Naperville, 2011 IL App (2d) 100695**

---

| | |
|---|---|
| Appellate Court Caption | PATRICK ENGINEERING, INC., Plaintiff-Appellant, v. THE CITY OF NAPERVILLE, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2-10-0695 |
| Filed | September 9, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from plaintiff's contract to perform consulting services for defendant city, the trial court erred in dismissing plaintiff's amended complaints seeking to recover for work performed under the contract, for additional work performed at the city's request and under theories of *quantum meruit*, account stated and a violation of the Local Government Prompt Payment Act. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 09-L-114; the Hon. John T. Elsner, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Phillip A. Luetkehans and Robert W. Funk, both of Schirott, Luetkehans & Garner, P.C., of Itasca, for appellant.

Patricia Johnson Lord and Mark Antonio Scarlato, both of City of Naperville, of Naperville, for appellee.

Panel

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. Justices Zenoff and Burke concurred in the judgment and opinion.


**OPINION**


¶ 1    The plaintiff, Patrick Engineering, sued the City of Naperville, alleging that the City breached a contract and also was unjustly enriched by the work Patrick performed for it. The trial court dismissed Patrick's third and fourth amended complaints, and Patrick appealed. We reverse and remand.

¶ 2    The following facts are taken from the allegations of the relevant pleadings, which, at this stage of the proceedings, we must take as true (*Kehoe v. Saltarelli*, 337 Ill. App. 3d 669, 675 (2003)), and from the exhibits to those pleadings. If there is a conflict between an allegation in a complaint and an exhibit to that complaint, the exhibit controls. *Id.* at 676.

¶ 3    In March 2007, the parties entered into a contract under which Patrick was to provide consulting services to the City in connection with the development of a stormwater asset management system and geographic information system (GIS). According to recitals of the contract, the City was in the midst of a project to develop a stormwater management system over its entire 45-square-mile service area. The first part of the project, which covered slightly more than half of the total area (Area A), was largely complete, and the purpose of the contract was to commence work necessary to complete the project in the remaining 23.5-square-mile area (Area B). The scope of the work, detailed in exhibit A to the contract, included among other things (1) performing a stormwater GIS needs analysis; (2) developing a detailed project plan and specifications for Area B; (3) collecting and scrubbing office and field data and performing data attribution and conversion for Area B based on "data accuracy and completion requirements defined within RFP [Request for Proposals]"; and (4) configuring and implementing Azteca Cityworks systems for managing stormwater operations and maintenance activities and other maintenance activities in certain City departments. As part of the specifications for the data collection and conversion for Area B, the contract required Patrick to collect, convert, and correct the data for a one-square-mile pilot area first. Under the contract, the pilot data and any necessary process changes were required to be "completed and accepted by the City prior to the vendor proceeding with the remainder of the data collection in Area B." The acceptance of the pilot area data was not

listed as a prerequisite for proceeding with any other aspect of the work under the contract.

¶ 4    On April 23, 2007, Debbie Kresl, the project manager for the City's transportation and traffic engineering department, sent an e-mail to Michael Blalock, one of Patrick's employees, stating:

> "Please take this e-mail as limited 'Notice to Proceed' with work related to the 'Field Data Collection and Conversion of Area B.' I have spoken with Mike Bevis, Purchasing Manager, and he authorized the limited Notice to Proceed."

A week later, the City issued a purchase order for the contract. The purchase order listed a cost for each of the various aspects of the contract, including $35,580 for the stormwater needs analysis; $73,420 for the pilot area data conversion; $244,306 for the remaining Area B data collection and conversion; $37,454 for the configuration and implementation of Azteca Cityworks for the stormwater maintenance system; and $44,432 for the project management and overhead costs. The total cost authorized under the purchase order was $436,392.

¶ 5    Patrick began work under the contract. It delivered the stormwater needs analysis to the City on July 3, 2007. On July 17, 2007, Patrick employee Scott Stocking met with Beth Lang, the City's strategic services manager, and "several other representatives from Naperville." Stocking told the others that the "feature count" (a basic rule for calculating costs) under the contract would be reached prior to the completion of the contract, and that a change order would be needed. Stocking e-mailed Lang on July 23, 2007, with the same message. One week later, the City informed Patrick that it would not issue a change order. Patrick then ceased work on the project.

¶ 6    On August 10, 2007, Lang wrote Stocking. In her letter, which was attached as an exhibit to the third amended complaint, Lang gave various reasons why the City staff did not believe that an increase in project costs was supported. Lang stated that the City would pay only a total of $85,728 for pilot area data that met the RFP specifications: the original $73,420 contained in the purchase order for that task; $11,108 for project management for the pilot area data collection; and $1,200 set aside in the purchase order for "proposed technical alternatives."

¶ 7    The letter continued, "the City is requesting that work on the pilot area resumes immediately and that Patrick Engineering delivers a completed 3 sq. mi. pilot [area report] *** no later than September 10, 2007." Lang then stated:

> "Upon delivery and review of the pilot data, the City will work with Patrick to determine if a change in scope to complete the remainder of Area B is required. At that time, the project specifications, feature count projections, and budget will undergo thorough review and any necessary changes will be made.
>
> Please note, until the pilot area [data] receives formal acceptance by the City, work performed in the remainder of Area B without prior authorization from the city's assigned Project Manager is at your own risk."

Patrick alleged that, "[b]ased on Lang's assurances that Naperville would make any necessary adjustments to the [p]roject budget, Patrick returned to work." Patrick also alleged that, during the last half of 2007, various "representatives" of the City, including Lang and

-3-

Larry Gunderson, the City's information technology team leader, told Patrick employees working on the project that the City would issue a change order once the pilot area data was accepted.

¶ 8    In count I of its third amended complaint, Patrick sought to recover both for work it performed under the contract and for additional work the City required it to do. As to the first, Patrick stated that it performed project management services, performed and delivered the stormwater needs analysis, performed and delivered the pilot area data conversion, converted data for Area B, and configured and implemented Azteca Cityworks. It sought to recover the contract price for those services.

¶ 9    Patrick also sought in count I to recover for its costs associated with extra work that it alleged the City required it to perform. The extra work consisted of: additional plans to be included in the GIS data; additional categories of plans to be converted and placed in the GIS; adjusting the data received from as-built drawings based on information identified in the field; and a change to the size of the area to be included in the GIS. Patrick also performed additional work that became necessary due to flaws in the data the City provided to Patrick, including improperly catalogued plans, as-built drawings that were incomplete or missing necessary data, and incorrect elevations on as-built drawings that required correction before they could be included in the GIS.

¶ 10   Patrick alleged that its president, Dan Dietzler, wrote the city manager, Robert Marshall, regarding the additional work it was performing. In February 2008, two vice presidents of Patrick met with William Novack, the city engineer and engineering services team leader, showed him Dietzler's letter, and discussed "the fact that Patrick was performing additional work at the direction of" the City. According to the complaint, Michael Bevis, the City's chief procurement officer, also knew no later than February 2008 that Patrick was performing additional work. Marshall, Novack, and Bevis did not instruct Patrick to stop working. Patrick alleged that it reasonably relied on the representations of Lang and Gunderson "that adjustments would be made to the project budget," and the knowledge of Marshall, Novack, and Bevis that it was performing additional work, in incurring hundreds of thousands of dollars in labor costs for the additional work.

¶ 11   Patrick alleged that the City made the changes and additions to the project outlined above, and alleged generally that it did so pursuant to section 2 of the contract. That section states as follows:

"Section 2–Additional Services

2.1 If the representative of the City responsible for the Project verbally requests the Consultant [Patrick] to perform additional services, the Consultant shall confirm in writing that the services have been requested and that such services are additional services. Consultant shall be under no obligation to provide said services until a period of thirty (30) days has elapsed or until the City has authorized those services in writing, whichever is earlier. Failure of the City to respond to the Consultant's confirmation of said services within thirty (30) calendar days of receipt of the notice shall be deemed rejection of, and refusal to pay for[,] the Additional Services. ***

* * *

-4-

2.2 The City may, upon written notice, and without invalidating this Agreement, require changes resulting in the revision or abandonment of work already performed by the Consultant, or requires [*sic*] other elements of the work not originally contemplated and for which full compensation is not provided in any portion of the Agreement. Any additional services, abandonment of services which were authorized by the City, or changes in services directed by the City which result in the revision of the scope of services provided for in Exhibit A that cause the payment due to the Consultant to exceed the amount set forth *** shall be addressed in an amendment to this Agreement."

¶ 12    Patrick did not allege that the City gave Patrick written authorization for the additional work or that the City council approved an amendment to the contract to cover the additional work. Rather, Patrick alleged that the representations and conduct of City agents described in its complaint gave rise to equitable estoppel and prevented the City from denying Patrick payment for the additional work in count I.

¶ 13    Count II of the third amended complaint related to additional work performed in the pilot area. On January 31, 2008, Patrick completed collecting and converting the pilot area data in a manner that allegedly complied with the standards under the contract, and it tendered the data to the City. Patrick alleged that the City unreasonably and unjustifiably refused to approve the pilot area data and imposed additional standards and rules for the data that were not in the contract. Patrick then expended substantial time and effort attempting to comply with the new standards (according to the complaint, $116,256 in extra costs). The parties agree that despite these attempts the City never approved the data. In this count Patrick sought to recover those extra costs, repeating its allegations from count I regarding the representations made by the City's agents and Patrick's reliance on those representations.

¶ 14    Count III of the third amended complaint raised a claim for recovery in *quantum meruit* for the work Patrick performed, including but not limited to the stormwater needs analysis and the pilot area data. Patrick alleged that the City knew it was performing these services, that it told the City that it expected payment for its services, that the value of the services it provided was in excess of $100,000, that the City accepted the value of the services, and that Patrick had no adequate remedy at law.

¶ 15    Count IV was titled "Accounts Stated," and alleged that between June 1, 2007, and September 10, 2008, Patrick sent the City several invoices for its work, totaling about $341,857. The City did not express any objection to any of the invoices, but it paid Patrick only about $77,312. (On January 21, 2009, after the City refused to pay any more, Patrick terminated the contract.) Patrick sought to recover on the remainder of the invoices. Count V was brought under the Local Government Prompt Payment Act (50 ILCS 505/1 *et seq.* (West 2010)) and contained essentially the same allegations as count IV.

¶ 16    The City moved to dismiss the third amended complaint pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615, 2-619 (West 2008)). Pursuant to section 2-615, it attacked the sufficiency of counts IV and V, arguing that the trial court had not specifically given Patrick leave to replead those counts after the second amended complaint was dismissed. The City further asserted that count IV (the claim for account stated) was insufficient because Patrick had not pled (and could not plead) that the

City had agreed that it owed the amount of the invoices. Most of the City's motion, however, was directed to arguing pursuant to section 2-619 that as a matter of law Patrick could not recover on its breach of contract claims for the additional services Patrick alleged it had performed (counts I and II), because Patrick did not allege that it obtained written authorization for the additional services as required by section 2 of the contract, and the doctrine of equitable estoppel did not apply under the allegations of the complaint. The City also argued as to count III that Patrick could not assert a claim for *quantum meruit* because a contract governed the entire relationship between the parties. Finally, as to count V, Patrick could not recover under the Local Government Prompt Payment Act if no money was owed.

¶ 17        The motion was fully briefed, and the trial court heard oral arguments on it. On March 17, 2010, the trial court issued a written order granting the City's motion, largely on the basis of the City's arguments. After the trial court had delivered its ruling, however, Patrick protested that in count I it was not seeking to recover only for additional services it performed, but also for work it did that was within the scope of the contract. Seeking to examine that claim with as much clarity as possible, the trial court then gave Patrick leave to file a fourth amended complaint, setting out in a separate count the work that Patrick contended had been performed within the scope of the contract, and told Patrick that it need not replead the remaining claims in order to preserve them for appeal.

¶ 18        Patrick then filed a fourth amended complaint, in which it focused on its breach of contract claim for nonpayment of services rendered that it contended were clearly within the scope of the contract, including the delivery of the stormwater needs assessment, the pilot area data collection and conversion, the collection of additional data in Area B, and the implementation of the Azteca Cityworks system. (Patrick also included a footnote referring to the trial court's ruling that the remaining claims were not waived and incorporating those claims by reference.) The City again moved to dismiss pursuant to sections 2-619 and 2-615 of the Code. In an argument purportedly brought pursuant to section 2-619, the City argued that Patrick's separately stated breach of contract claim was insufficient because: (a) it alleged that the City owed Patrick "in excess of" the amounts approved in the purchase order for each aspect of the work Patrick claimed to have performed, rather than seeking only the contract amounts; (b) it did not adequately specify what services it performed that were within the scope of the contract; and (c) Patrick sought to recover for data collection done in Area B despite the fact that the pilot area data was never approved. The City also moved pursuant to section 2-615 to strike a paragraph seeking prejudgment interest, on the ground that Patrick had not adequately alleged any basis for such a claim. Finally, the City reasserted its previous arguments directed toward Patrick's other claims that were incorporated by reference. Patrick responded that the allegations fully apprised the City of the work it claimed to have performed under the contract, that the "in excess of" language was a scrivener's error and did not require the claim's dismissal, and that, even if the City's argument about data collection in Area B were true (and it was not), that would not support dismissal of its claim for payment for the other work performed.

¶ 19        On June 22, 2010, the trial court granted the motion to dismiss the fourth amended complaint, stating that the breach of contract claim contained in it did not adequately describe the work Patrick performed pursuant to the contract. Patrick filed a timely notice

of appeal.

¶ 20                                    ANALYSIS

¶ 21       On appeal, Patrick contends that the trial court erred in dismissing: (1) its claim for work performed within the scope of the contract (the fourth amended complaint); (2) its claims for additional work Patrick performed pursuant to the City's requests and/or with its knowledge (counts I and II of the third amended complaint); (3) its claim for *quantum meruit* (count III of the third amended complaint); and (4) its claims for account stated and violation of the Local Government Prompt Payment Act (counts IV and V of the third amended complaint).

¶ 22       A motion to dismiss brought under section 2-615 of the Code attacks the sufficiency of the complaint on the basis that, even assuming the allegations of the complaint to be true, the complaint does not state a cause of action that would entitle the plaintiff to relief. 735 ILCS 5/2-615 (West 2010); *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 8 (1992). A section 2-619 motion to dismiss likewise assumes that the allegations of the complaint are true but asserts an affirmative defense or other matter that would defeat the plaintiff's claim. 735 ILCS 5/2-619 (West 2010); *Nielsen-Massey Vanillas, Inc. v. City of Waukegan*, 276 Ill. App. 3d 146, 151 (1995). Under either section, a claim should not be dismissed on the pleadings "unless it is clearly apparent that no set of facts can be proved which will entitle [the] plaintiff to recover." *Id.* We review *de novo* the dismissal of a complaint pursuant to either section. *Wallace v. Smyth*, 203 Ill. 2d 441, 447 (2002).

¶ 23           The Fourth Amended Complaint: Breach of Contract Claim

¶ 24       To plead a claim for breach of contract, a party must allege that: (1) a contract exists; (2) the plaintiff performed its obligations under the contract; (3) the defendant breached the contract; and (4) the plaintiff sustained damages as a result of the breach. *International Supply Co. v. Campbell*, 391 Ill. App. 3d 439, 450 (2009). Here, the allegations of the separate breach of contract claim contained in the fourth amended complaint comply with these requirements. As to the first, Patrick alleged that there was a contract between the parties and attached that contract to the complaint. As to the second requirement, Patrick alleged that it was to perform six tasks under the contract: perform and deliver a "Stormwater Needs Analysis," configure and implement Azteca Cityworks, perform specific proposed technical alternatives and data integration, collect and convert pilot area data, collect and convert data in Area B, and manage the project. Patrick alleged that it performed each of these tasks. Specifically, Patrick alleged that, between April and June of 2007, it completed and delivered the stormwater needs analysis and implemented Azteca Cityworks. Patrick alleged that it performed the specific proposed technical alternatives and implemented data integration in May 2007. Patrick alleged that it collected and converted the pilot area data beginning in April 2007 and tendered that data, in appropriate form, to the City on January 31, 2008. Between April 2007 and January 2008, Patrick alleged, it also performed work necessary to collect and convert data from Area B. Finally, Patrick alleged that it performed project management duties from April 2007 to April 2008. As to the third and fourth requirements to state a claim–breach by the defendant and resulting damages–Patrick alleged

-7-

that the City breached the contract by not paying Patrick for the work it performed pursuant to the contract and that this nonpayment damaged it. Thus, Patrick adequately pled a breach of contract claim in the fourth amended complaint.

¶ 25 The City argues that the fourth amended complaint was properly dismissed because Patrick did not properly allege the amount of damages the City owed it, but not surprisingly the City fails to cite any case law suggesting that a plaintiff must specify at the pleading stage the exact amount of damages it seeks. Accordingly, this argument is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006); *Mikolajczyk v. Ford Motor Co.*, 374 Ill. App. 3d 646, 677 (2007).

¶ 26 The City also argues that Patrick may not recover any amounts under the contract because the contract provided that further work in Area B was contingent upon the City's acceptance of the pilot area data. The relevant provision is found in the portion of exhibit A to the contract titled "Data Collection and Conversion of Area B." The listed requirements and specifications for such data collection include the following:

"Perform pilot area data collection, conversion and datum correction for an approximate 1 square mile area that includes representative sub area's [*sic*] with as-built source information, engineering drawing source information and no source information in order to validate proposed office and field procedures, QA/QC methods and appropriate levels of attribution, completeness and accuracy. *** The pilot data and any required process changes must be completed and accepted by the city prior to the vendor proceeding with the remainder of the data collection in Area B."

This provision unmistakably states that Patrick could not proceed with *data collection* in the remainder of Area B until the pilot area data and recommended process changes were accepted by the City. However, there is no language indicating that the City's acceptance of the pilot area data was a prerequisite to performing the work on any other aspect of the project, such as the stormwater needs assessment, the implementation of Azteca Cityworks, etc.

¶ 27 In construing a contract, we look first to the express wording of the contract, because the language of a contract, given its plain and ordinary meaning, is the best indication of the parties' intent. *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007). Here, the language of the contract does not provide any basis for inserting this same prerequisite–acceptance of the pilot area data before further work could proceed–into the other tasks that Patrick was to perform under the contract. Thus, the City's nonacceptance of the pilot area data (a nonacceptance that Patrick alleged was itself wrongful and unjustified) does not prevent Patrick from suing to recover payment for the tasks it performed other than data collection. Moreover, Patrick points to Kresl's April 2007 e-mail (attached as an exhibit to the complaint), in which Kresl stated that the City's procurement officer had authorized Patrick to proceed with the "Field Data Collection and Conversion of Area B," to support its contention that it was also entitled to be paid for its data collection work. A claim may not be dismissed on the pleadings unless no set of facts can be proved that will entitle the plaintiff to recover. *Nielsen-Massey Vanillas*, 276 Ill. App. 3d at 151. At this stage of the proceedings, the City has not shown that Patrick cannot recover under the contract for the

work it allegedly performed.

¶ 28 In addition to the contract, the City also relies on Lang's August 2007 letter to Patrick as support for its argument that the nonacceptance of the pilot area data bars recovery for all of the work done under the contract. In that letter, Lang stated that "until the pilot area receives formal acceptance by the City, work performed in the remainder of Area B without prior authorization from the city's assigned Project Manager is at your own risk." The phrase "work performed in the remainder of Area B"–which the City reads to mean "any work performed in Area B," not simply data collection–is not the language of the contract, however. It is merely Lang's interpretation of the contract. The City cites no legal authority for the proposition that an agent's interpretation of a contract controls over the terms of the contract itself. (Indeed, the City cites no legal authority at all in the portion of its appellee brief relating to the dismissal of the fourth amended complaint.) In summary, the City has not shown that either the contract provision relating to acceptance of the pilot area data or Lang's letter bars Patrick's breach of contract claim. We therefore reverse the dismissal of the breach of contract claim in Patrick's fourth amended complaint.

¶ 29 Third Amended Complaint: Claims Relating to Additional Work

¶ 30 We turn next to the dismissal of counts I and II of the third amended complaint, which were titled as breach of contract claims and related to the extra work Patrick alleged it performed outside the scope of the contract at the City's request. (We leave aside here the allegations in count I relating to work performed under the contract, which were restated separately as the breach of contract claim in the fourth amended complaint, discussed above.) On appeal, Patrick characterizes these counts as seeking to recover for two types of extra work: that requested by the City in connection with Patrick's collection of the pilot area data, such as the inclusion of additional categories or sources of data (count I), and the extra work Patrick allegedly performed in its effort to meet the City's "improperly constituted and wrongfully imposed" pilot area data acceptance criteria (count II).

¶ 31 The City argues that section 2.1 of the contract required Patrick to obtain written authorization before performing extra work and that Patrick did not do so, thus defeating Patrick's breach of contract claims for compensation for the extra work. Patrick concedes that it did not have written authorization for the additional work, but argues that the representations and conduct of the City's agents created circumstances in which the doctrine of equitable estoppel should be applied to estop the City from denying payment for the extra work. The viability of counts I and II of the third amended complaint thus depend on this issue: has Patrick adequately alleged facts that could give rise to the application of equitable estoppel against the City?

¶ 32 Our supreme court has described the concept of equitable estoppel as follows:

"The general rule is that where a person by his or her statements and conduct leads a party to do something that the party would not have done but for such statements and conduct, that person will not be allowed to deny his or her words or acts to the damage of the other party. [Citations.] Equitable estoppel may be defined as the effect of the person's conduct[,] whereby the person is barred from asserting rights that might

otherwise have existed against the other party who, in good faith, relied upon such conduct and has thereby been led to change his or her position for the worse." *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313 (2001).

Thus, under appropriate circumstances, the doctrine of equitable estoppel prevents a party from asserting a defense that might otherwise be valid. See *Witherell v. Weimer*, 85 Ill. 2d 146, 158 (1981) (doctors who had concealed the cause of plaintiff's blood clots could not assert statute of limitations defense); *Ankus v. Government Employees Insurance Co.*, 285 Ill. App. 3d 819, 822 (1996) (estoppel may be applied to prevent one party to a contract from asserting a contractual condition where the party has fostered the impression that the condition would not be asserted). Here, the application of the doctrine would prevent the City from raising the defense of noncompliance with the contract provisions requiring written authorization for additional work. Unlike waiver, which requires that one party intend to relinquish a particular right, estoppel focuses on the effect of the first party's actions that are alleged to have misled the other party and the prejudice that allegedly arose from the other party's reliance on those actions, and it is this prejudice, not the first party's intent, that results in the loss of that party's rights. *Vaughn v. Speaker*, 126 Ill. 2d 150, 161 (1988).

¶ 33    The doctrine of equitable estoppel is applicable to municipal bodies. *Kenny Construction Co. of Illinois v. Metropolitan Sanitary District of Greater Chicago*, 52 Ill. 2d 187, 197 (1971). Although a municipal body generally cannot be estopped by an act of its agent beyond the authority conferred upon that agent, that general rule is qualified and a party may invoke the doctrine of equitable estoppel against a municipality where: (1) "his action was induced by the conduct of municipal officers," and (2) "in the absence of such relief he would suffer a substantial loss and the municipality would be permitted to stultify itself [that is, unfairly assert its own incapacity to act] by retracting what its agents had done." *Cities Service Oil Co. v. City of Des Plaines*, 21 Ill. 2d 157, 161 (1961). The question of whether estoppel should be applied against a municipality in a particular case must be made on an individual basis, after considering all of the circumstances of the case. *Stahelin v. Board of Education, School District No. 4*, 87 Ill. App. 2d 28, 39 (1967). "If under all of the circumstances, the affirmative acts of the public body have created a situation where it would be inequitable and unjust to permit it to deny what it has done or permitted to be done, the doctrine of estoppel may be applied against it." *Id.*

¶ 34    In this case, the matter comes before us at the pleading stage pursuant to a motion to dismiss, before discovery or the presentation of evidence. Accordingly, we must take all well-pled allegations of fact as true and draw all reasonable inferences in favor of the plaintiff, and we should not dismiss a claim unless it is apparent that the plaintiff could not recover under any set of facts that it might eventually be able to muster. *Nielsen-Massey Vanillas*, 276 Ill. App. 3d at 151.

¶ 35    Examining counts I and II of the third amended complaint, we believe that they allege sufficient conduct and statements on the part of City agents to raise a colorable claim of equitable estoppel. In order to plead a claim of equitable estoppel, a plaintiff must allege that (1) it was induced to act by the affirmative actions (statements or conduct) of the municipality's officers, and (2) it reasonably relied upon those actions, thereby incurring expenses such that it would suffer a substantial loss if equitable estoppel were not applied.

-10-

*Cities Service Oil*, 21 Ill. 2d at 161; *County of Du Page v. K-Five Construction Corp.*, 267 Ill. App. 3d 266, 273 (1994). Here, Patrick alleged that City officials, including the strategic services manager and the information technology team leader, told Patrick that it would be compensated for the extra work that it was performing once the pilot area data was accepted. The exhibits to the third amended complaint show the names of these persons, along with the technology project manager, on e-mails and letters to and from Patrick, raising the reasonable inference that they were involved in managing the project for the City. Patrick also alleged that the city manager, the chief procurement officer, and the city engineer all were aware of the extra work that Patrick was performing and that Patrick was performing that additional work at the direction of the City. Patrick stated that it relied on the statements of certain City agents and the apparent tacit agreement of others in deciding to perform the extra work, thereby incurring hundreds of thousands of dollars of extra expense. These allegations are sufficient to make out a claim of equitable estoppel.

¶ 36    The City argues that the acts of its employees cannot bind it or provide the basis for estoppel unless the employees had authority to modify the contract. In support, the City cites *Nielsen-Massey Vanillas*, 276 Ill. App. 3d at 155-56, for the proposition that "the affirmative act which induces the plaintiff's reliance must be an act of the municipality itself, such as legislation, rather than the unauthorized acts of a ministerial officer." The City argues that the only persons authorized to act for the City were its "corporate authorities," *i.e.*, its mayor and city council members. As Patrick did not allege that any of these persons made representations regarding payment for the extra work ordered by City employees, the City contends that Patrick's assertion of equitable estoppel is fatally deficient.

¶ 37    As an initial matter, we find *Nielsen-Massey Vanillas* (like *D.C. Consulting Engineers, Inc. v. Batavia Park District*, 143 Ill. App. 3d 60, 63 (1986), upon which the City also relies) distinguishable and inapplicable, in that it is part of a line of cases in which the court held that the entire contract under which the plaintiff sought to recover was *ultra vires*–that is, it was beyond the power of the municipal body to enter into and thus was void *ab initio*. See, *e.g.*, *Nielsen-Massey Vanillas*, 276 Ill. App. 3d at 154; *South Suburban Safeway Lines, Inc. v. Regional Transportation Authority*, 166 Ill. App. 3d 361 (1988); *D.C. Consulting*, 143 Ill. App. 3d 60. In *Nielsen-Massey Vanillas*, the plaintiff corporation alleged that the defendant city breached an agreement to loan the plaintiff money in connection with its relocation to the defendant city. This court held that the alleged agreement was *ultra vires* because the city council had not previously appropriated any money for the agreement. Section 8-1-7 of the Illinois Municipal Code (65 ILCS 5/8-1-7 (West 1994)) provided that "no contract shall be made by the corporate authorities, or by any committee or member thereof *** unless an appropriation has previously [been] made concerning that contract." Although as a home rule city the defendant had the power to waive this requirement through an explicit city council vote to do so, no such vote had been taken. *Nielsen-Massey Vanillas*, 276 Ill. App. 3d at 153. The court's later rejection of the plaintiff's equitable estoppel argument (*id*. at 153-54) is consistent with the long-standing rule that a contract that is void *ab initio* (because, for instance, it was *ultra vires*) cannot be enforced by ratification or estoppel.

¶ 38    In our case, the City has not suggested that the contract with Patrick was *ultra vires*. However, it does argue that, just as with an *ultra vires* contract, a contract modification that

did not follow the prescribed procedure is void and is not subject to an assertion of equitable estoppel. In *Stahelin*, this court addressed exactly this argument. After a lengthy review of the case law we ultimately rejected the argument, explaining that the law distinguishes between two different situations involving municipal contracts and the application of equitable estoppel:

> "Contracts entered into by a municipality which are expressly prohibited by law, and which under no circumstances can be entered into, are void and ultra vires. They may not be rendered valid thereafter by estoppel or ratification on the part of the municipality. However, there is another class of municipal contracts, distinct from the void type heretofore referred to, wherein the municipality has the power to enter into the contract, but where a portion thereof may be beyond its power, or its power may have been irregularly exercised. As to this class of contracts, a municipality may not assert its want of authority or power, or the irregular exercise thereof, where to do so would give it an unconscionable advantage over the other party. Municipal corporations, as well as private corporations and individuals, are bound by principles of common honesty and fair dealing." *Stahelin*, 87 Ill. App. 2d at 41-42 (citing *McGovern v. City of Chicago*, 281 Ill. 264, 283 (1917), and *People ex rel. Stead v. Spring Lake Drainage & Levee District*, 253 Ill. 479, 500 (1912)).

In *Kenny*, the supreme court cited this analysis in *Stahelin* with approval. *Kenny*, 52 Ill. 2d at 199.

¶ 39    In *Stahelin*, as here, the municipal body had the general power to enter into the contract at issue, as well as the power to authorize expenditures for extra work. As in *Stahelin* (and unlike in *Nielsen-Massey Vanillas* and *D.C. Consulting*), the initial contract here was properly authorized by the corporate authorities. The issue is not one of general authority to act but, rather, the irregular manner in which extra work was ordered. See *Stahelin*, 87 Ill. App. 2d at 42. Thus, equitable estoppel may be applied against the municipal body. *Id.* Accordingly, we find *Nielsen-Massey Vanillas* and *D.C. Consulting* distinguishable and reject the City's argument that, although the contract as a whole is not void, the alleged modifications to it should be viewed as void and not subject to estoppel.

¶ 40    Even if *Nielsen-Massey Vanillas* were applicable here, however, we find problematic its statement that "the affirmative act which induces the plaintiff's reliance must be an act of the municipal entity itself, such as legislation, rather than the unauthorized acts of a ministerial officer." *Nielsen-Massey Vanillas*, 276 Ill. App. 3d at 155-56. We are aware of a number of appellate decisions that recite this same proposition–that equitable estoppel does not apply to a municipality where the agent whose affirmative acts form the basis for the estoppel was not explicitly authorized to perform those acts. See, *e.g.*, *id.*; *Village of Wadsworth v. Kerton*, 311 Ill. App. 3d 829, 837 (2000); *County of Du Page*, 267 Ill. App. 3d at 273; *Bank of Pawnee v. Joslin*, 166 Ill. App. 3d 927, 939 (1988); *American National Bank & Trust Co. of Chicago v. Village of Arlington Heights*, 115 Ill. App. 3d 342, 348 (1983). This proposition in essence seeks to add a third requirement for equitable estoppel and would require a plaintiff to show either that the municipality's corporate authorities themselves created the estoppel, or that the municipal agent possessed formal authority to act as he or she did. The validity of this proposition is far from clear, however.

¶ 41     The proposition is contrary to the holding of *Cities Service Oil*, in which the supreme court stated that, where municipal officers acted in such a manner as to mislead a person to his or her substantial detriment, a plaintiff could invoke equitable estoppel as an exception to the general rule that a municipality cannot be estopped by an agent's unauthorized acts. *Cities Service Oil*, 21 Ill. 2d at 161. In that case, the city of Des Plaines's building commissioner had issued a building permit and then approved the permit's transfer to the plaintiff, and the mayor did not revoke the permit until several months later, after the plaintiff had expended substantial amounts in reliance on the permit. Although there was no suggestion that the building commissioner was a "corporate authority" of the city, the supreme court held that equitable estoppel prevented the city from revoking the permit. *Id.* at 163. The principle that estoppel may be applied against a municipality when the appropriate circumstances exist, even where the municipal actor was not one of the municipality's corporate authorities, was confirmed by the supreme court in subsequent decisions. See, *e.g.*, *Kenny*, 52 Ill. 2d at 197 (sanitary district was estopped where its chief engineer, not a "corporate authority," was the one who asked Kenny to go ahead with extra work); *Hickey v. Illinois Central R.R. Co.*, 35 Ill. 2d 427, 449 (1966) (equitable estoppel applied where a variety of agents representing different governmental entities all treated land in question as belonging to railroad). We have no reason to doubt the principle's continued vitality.

¶ 42     By contrast, the proposition cited by the City here appears to be a creature of appellate court opinions only; we have been unable to find the proposition expressed in any supreme court decision. Moreover, the quoted principle appears to have its roots in *Sinclair Refining Co. v. City of Chicago*, 246 Ill. App. 152 (1927), a pre-1935 appellate court decision that has no precedential value. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 95 (1996). Accordingly, we decline the City's invitation to restrict the doctrine of equitable estoppel to those cases in which the affirmative act causing the detrimental reliance was accomplished through legislation or by the members of the municipality's governing body.

¶ 43     We note that the principle we follow here–that equitable estoppel may apply even where the affirmative act on which the plaintiff relied was not performed by the municipality's corporate authorities–also surfaces in a number of appellate court cases. A common thread in these cases is that the municipality's governing body delegated (either expressly or impliedly) its authority in a particular area to the agent in question. For instance, in *Stahelin*, the court found that the governing body of the entity in question (the school board) had expressly delegated its authority to modify a building contract to the architect via a letter instructing the builder to follow the architect's instructions in doing extra work. *Stahelin*, 87 Ill. App. 2d at 36. The architect often issued verbal orders for extras, and the school board was therefore estopped from refusing to pay for those extras on the ground that they were not approved in writing as required by the contract. *Id.* at 39. Similarly, in *Marziani v. Lake County Zoning Board of Appeals*, 87 Ill. App. 3d 425, 429 (1980), the court rejected the county's argument that the agents who had issued building permits to the plaintiffs had exceeded their authority merely because the construction was contrary to the zoning ordinance, where the county building code gave certain agents discretion to determine if zoning requirements were met. See also *County of Du Page*, 267 Ill. App. 3d at 274 (director

of the county building department had the authority to determine whether a property was in violation of the zoning ordinance, and thus his determination that there was no violation estopped the county from contending otherwise when the property owner had relied on that determination in deciding to make substantial expenditures). Here, Patrick has alleged that persons who appear to have been designated by the corporate authorities to oversee the stormwater management project made representations to Patrick that induced it to perform the extra work. Although the ultimate validity of these allegations must be determined through the litigation process, Patrick's claims are sufficient to withstand a motion to dismiss.

¶ 44 In reversing the dismissal of counts I and II of the third amended complaint, we do not mean to suggest that Patrick will necessarily prevail on those claims. It is of course quite possible that Patrick will be unable to prove, for instance, that the services it provided were in fact "extras" beyond those which it was contractually obligated to perform, or that its reliance on the representations it received was reasonable, or some other necessary element. All of these are issues of fact, however, that are not appropriate for resolution at the pleading stage. We merely hold here that Patrick may proceed further through the adversary process with these claims.

¶ 45 Third Amended Complaint: *Quantum Meruit* Claim

¶ 46 Patrick next contends that the trial court erred in dismissing count III of the third amended complaint, which asserted a claim of *quantum meruit*. The City argues that this claim must be dismissed because in it Patrick alleged that "no contract govern[ed] the payment" for the services it provided, thereby contradicting the other allegations of the third and fourth amended complaints in which Patrick alleged the existence of a contract between the parties and sought damages for breach of that contract. The City correctly notes that a party cannot recover in *quantum meruit* where a valid contract governs the relationship between the parties; in that situation, any remedy must be pursuant to the contract. *Prignano v. Prignano*, 405 Ill. App. 3d 801, 820 (2010).

¶ 47 *Quantum meruit* is an equitable theory under which a party can obtain restitution for the unjust enrichment of the other party, and it is often pleaded as an alternative to a breach of contract claim so that the plaintiff can recover the value of its work even if the trial court finds that the plaintiff cannot recover under the contract. *Weydert Homes, Inc. v. Kammes*, 395 Ill. App. 3d 512, 522 (2009). Plaintiffs are permitted to plead such alternate theories of recovery under Illinois law, even when they rest on inconsistent sets of facts. *Heastie v. Roberts*, 226 Ill. 2d 515, 557-58 (2007). "Where, as here, the facts are controverted, determining which, if any, of the possible theories is meritorious is a question for the trier of fact." *Id.* at 558. As this court held in *Weydert Homes*, 395 Ill. App. 3d at 522, "[t]he fact that [the] plaintiff pleaded the existence of a written contract does not preclude it from pleading *quantum meruit* in the alternative."

¶ 48 Here, Patrick alleged in counts I and II of the third amended complaint that the additional work was performed under the contract because it was necessitated by the City's changing demands and thus the City, in essence, modified the contract to include that work. In

response, the City contended that the extra work was not covered under the contract and that the City was not liable under the contract to pay for that work. Patrick also sought damages (in its fourth amended complaint) for breach of contract because the City has not paid for the work Patrick performed that was directly within the scope of the contract, and the City also disputed (through its motion to dismiss) that it owed Patrick for this work. In its *quantum meruit* claim in count III, Patrick alleged alternately that it was entitled to recover for at least some of this work even if the City was not liable under the contract, because the City knew that Patrick was performing the work, knew that Patrick expected to be paid for the work, and accepted the benefits of the work. Under these circumstances, where the scope and enforceability of the contract are disputed by the parties, there is no bar to pleading *quantum meruit* as an alternate basis for recovery. See *id.* (contractor who does not substantially perform under a contract may nevertheless seek recovery in *quantum meruit*); *Ryan v. Warren Township High School District No. 121*, 155 Ill. App. 3d 203, 206 (1987) (where contract between school district and contractor was voidable because it was not properly entered into, contractor could recover in *quantum meruit*).

¶ 49    The City argues that *Weydert Homes* is distinguishable because here, unlike in that case, Patrick "incorporate[d] a reference to its contract with the defendant" in count III itself and did not merely allege the existence of the contract elsewhere in the complaint. However, the relevant allegation states only that the parties "understood and intended" that Patrick's compensation for the work it performed would be the same as under the contract. This was simply a shorthand method of alleging the rates of compensation sought, not an acknowledgment that the contract governed the parties' relationship. Thus, the allegations of count III are not self-contradictory. We also reject the City's arguments that Patrick's allegations regarding the scope of the contract elsewhere in the complaint were judicial admissions. *Dreyer Medical Clinic, S.C. v. Corral*, 227 Ill. App. 3d 221, 226 (1992) (statement made in good faith as part of alternate fact pleading cannot be used as an admission).

¶ 50    In dismissing the *quantum meruit* claim, the trial court stated that "both parties agree that their relationship is governed by a valid contract." As can be seen, this statement was incorrect. Although both parties agreed that the contract existed, they disagreed as to its scope and applicability to the work performed by Patrick, and thus did not agree that their relationship was governed by the contract. Accordingly, the trial court's finding that "there was a contract which governed the relationship of the parties," which was made prior to the consideration of any evidence regarding the contract other than the few documents attached to the complaint, was premature. *Weydert Homes*, 395 Ill. App. 3d at 522. We reverse the dismissal of count III of the third amended complaint.

¶ 51                    Third Amended Complaint: Remaining Claims

¶ 52    Lastly, Patrick argues that the trial court erred in dismissing counts IV and V of his third amended complaint. Count IV was a claim for account stated. An account stated is a method of proving damages for the breach of a promise to pay on a contract. *Dreyer*, 227 Ill. App. 3d at 226. Count V alleged a violation of the Local Government Prompt Payment Act (50

ILCS 505/3 (West 2008)), under which a local government is required to approve or disapprove a bill from a vendor or contractor within 30 days of receiving it, and must notify the vendor or contractor "immediately" via a mailed written notice if a bill is disapproved. Through both of these counts, Patrick attempted to establish that the amount owed by the City for the services Patrick provided was equal to the full amount of the invoices Patrick submitted for work on the project. According to the allegations of the third amended complaint, the City did not object to, dispute, or disapprove the invoices, but it also did not pay most of them. (Patrick alleged that the City paid approximately $77,000.) In count V, Patrick also sought interest on the amount of the invoices.

¶ 53    Neither of these counts alleges a freestanding claim against the City; rather, both are essentially mechanisms for seeking a certain type or level of damages in the event that the City is held liable on the other claims asserted by Patrick. Accordingly, the trial court dismissed them because it also dismissed the underlying substantive claims against the City. We have reversed the dismissal of those underlying claims, and so we would ordinarily reverse the dismissal of counts IV and V as well. However, the City argues on appeal that we should not simply reinstate these claims.

¶ 54    With respect to the claim for account stated in count IV, the City argues that a party may not recover on an account stated unless there was an agreement between the parties as to the amount to be paid, and here there was no agreement–the City disputes the amounts shown in the invoices on a multitude of grounds and indeed contends that it owed Patrick nothing at all. However, the issue of whether the City sufficiently disputed the invoices is a question of fact, and therefore it is not ripe for resolution at the pleading stage. See *Dreyer*, 227 Ill. App. 3d at 226 ("Whether an account stated exists is a question for the trier of fact to resolve."). A claim for account stated requires a plaintiff to allege that: the parties had an agreement under which one party was regularly billed for services provided by the other party; the party providing the services billed the other (or provided other statements of the amounts due on the account); and the party owing the money did not dispute the correctness of the bills but also did not pay. See *id.* The contract attached to the complaint contains provisions under which Patrick was to regularly bill the City for its work and the City was to make regular payments. Patrick alleged that the City did not object to the invoices but only partly paid them. Thus, Patrick has adequately alleged the necessary facts. At this stage, those allegations must be taken as true. *Nielsen-Massey Vanillas*, 276 Ill. App. 3d at 151. The City's current opposition to paying Patrick anything does not foreclose the possibility that Patrick could establish an account stated for the invoices that it sent.

¶ 55    The City raises a similar argument with respect to count V, arguing that the City is not liable under the Local Government Prompt Payment Act because Patrick never provided the goods or services that would justify its invoices, and thus the statute did not obligate the City to pay the invoices. As with the argument relating to count IV, this is an argument that addresses the merits of Patrick's claims, and thus it is not a proper basis for dismissal pursuant to section 2-615 or 2-619 of the Code. Accordingly, we reverse the dismissal of counts IV and V of the third amended complaint.

¶ 56    For all of the foregoing reasons, the judgment of the circuit court of Du Page County dismissing the third and fourth amended complaints is reversed in its entirety, and the claims

-16-

stated therein are reinstated and the cause remanded for further proceedings.

¶ 57      Reversed and remanded.