# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Morgan Place of Chicago v. City of Chicago, 2012 IL App (1st) 091240**

---

| | |
|---|---|
| Appellate Court Caption | MORGAN PLACE OF CHICAGO, an Illinois Corporation, d/b/a JMC Development; JERRY JERONE CEDICCI; and BAC.CC, INC., an Illinois Corporation, Plaintiffs and Counterdefendants-Appellants and Cross-Appellees, v. THE CITY OF CHICAGO, a Municipal Corporation, Defendant and Counterplaintiff-Appellee and Cross-Appellant (Christopher Bushnell, Interim Director, Department of Construction and Permits; John Doe, Commissioner of the Department of Buildings of the City of Chicago; and Thomas P. Smith, Zoning Administrator of the City of Chicago, Defendants; Anthony Cedicci, Counterdefendant). |
| District & No. | First District, Third Division<br>Docket Nos. 1-09-1240, 1-10-0195 cons. |
| Filed | June 29, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A city could not be ordered to allow construction of a residential development where the building permit was issued to the developer after the city had reclassified the property and residential development was not allowed under the new classification and where the developer had actual or constructive notice of the reclassification and had not substantially changed its position in reliance on the prior classification. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-CH-11618; the Hon. Mary Anne Mason, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | William J. Harte, of Chicago (Erik D. Gruber, of counsel), for appellants. |
| | Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and J. Mark Powell, Assistant Corporation Counsel, of counsel), for appellee. |
| Panel | PRESIDING JUSTICE STEELE delivered the judgment of the court, with opinion. |
| | Justice Salone concurred in the judgment and opinion. |
| | Justice Murphy specially concurred, with opinion. |

**OPINION**

¶ 1    Following a bench trial in the circuit court of Cook County, the trial judge ruled defendant City of Chicago (City) was not equitably estopped from revoking a building permit issued to plaintiff Morgan Place of Chicago (Morgan Place), an Illinois corporation doing business as JMC Development (JMC), and that Morgan Place and plaintiffs Jerry Jerome Cedicci (Cedicci) and BAC.CC, Inc. (collectively plaintiffs), did not have vested rights in the issuance of the permit. The trial judge also entered judgment for the plaintiffs on the City's counterclaim, which alleged, in relevant part, that Cedicci and his brother, counterdefendant Anthony Cedicci (Anthony), violated local ordinances regarding gifts to City employees. The trial judge further denied plaintiffs' petition for costs and fees as a sanction against the City for asserting false and harassing counterclaims. Plaintiffs now appeal and the City cross-appeals.[1] For the following reasons, we affirm the judgment of the circuit court.

¶ 2                              BACKGROUND

¶ 3    The record on appeal discloses the following facts. In 1993, Cedicci, a real estate developer, acquired the property at 373-75 North Morgan Place in Chicago, Illinois, as part of the Morgan Sangamon Partnership. The property, which consisted of two parcels,

_____

[1]Defendants Christopher Bushnell, interim director, department of construction and permits; John Doe, commissioner of the department of buildings of the City of Chicago; and Thomas P. Smith, zoning administrator of the City of Chicago, are not parties to this appeal. Counterdefendant Anthony Cedicci is also not a party to this appeal.

encompassed approximately two city blocks. The eastern part of the property had a warehouse; the western part was covered by a concrete slab.

¶ 4    At the time of the purchase, the property was zoned M-2, denoting light manufacturing under the City of Chicago Zoning Ordinance (see Chicago Municipal Code § 17-40-050 (1993)). Shortly after the purchase, at Cedicci's request, the property was rezoned C-2. The C-2 classification permits commercial ground-floor use with residential units above ground level.

¶ 5    The Morgan Sangamon Partnership opened an antiques market in the existing building on the property. The partnership also leased space to Cedicci's brother, Anthony, through the 72 East Walton Bakery, Inc. Anthony operated the La Boursa restaurant at the Morgan Place location. The lease was later amended to give Anthony the option to purchase the property.

¶ 6    Around 1996, Cedicci decided to develop the property for residential use. Cedicci hired an architect, Paul Moser, to prepare plans for constructing a 44-unit condominium building above a ground-floor warehouse.

¶ 7    On October 28, 1997, an ordinance was introduced in the Chicago city council to create a planned manufacturing district (PMD) for an area of the city in which the property is located. A PMD is an area set aside for manufacturing and commercial use to prevent residential encroachment. The purpose of a PMD is promote retention of industry and a diverse workforce in the city.

¶ 8    On February 4, 1998, the Chicago plan commission sent property owners of record within the proposed PMD notice of a public hearing on the rezoning ordinance. On February 15, 1998, the city council's committee on zoning sent notices to the same group about a public hearing on the ordinance. On March 12, 1998, the Chicago plan commission held a special hearing on the proposal and later recommended its approval. On April 1, 1998, the city council approved the creation of the PMD and an amendment to the Chicago Municipal Code changing the zoning within the PMD. See Chicago Municipal Code § 16-8-110 (amended April 1, 1998).

¶ 9    At trial, Cedicci denied knowledge of the creation of the PMD. Moser testified he was aware of the pending ordinance amendment. Moser recalled there was some urgency in getting a building permit application prior to its enactment.

¶ 10    On or about March 12, 1998, JMC Development, Inc., in which Cedicci had an ownership interest, submitted a permit application with the City's department of buildings to develop the property. Cedicci could not recall whether JMC was in fact incorporated at the time. The application was accompanied by the architectural plans for the mixed-use building.

¶ 11    Following the submission of the permit application, it was reviewed by a number of City departments. In most cases, the zoning department is the first to review a building permit application because the application will be rejected without further review if the proposed use is not a permitted use under the applicable zoning classification. Notwithstanding the April 1, 1998, rezoning of the property, Cedicci's application was stamped as approved on May 3, 1999.

¶ 12    On June 20, 2000, the City issued a building permit to JMC. The permit recites in part:

"Any changes in contractor or deviation from approved plans must be approved by the Department of Buildings. Permit may be revoked for violation of any of the above provisions or other applicable ordinance."

Cedicci paid $68,425 for issuance of the permit, including fees assessed only for residential projects. Although Cedicci had soil testing done in 2000, construction on the project did not commence immediately.

¶ 13    Meanwhile, the ownership of the property had changed. On February 24, 1998, Cedicci filed for bankruptcy, an event dissolving the Morgan Sangamon Partnership and reconstituting the partnership with the remaining partners. According to Cedicci, the bankruptcy was dismissed after his creditors were paid in full. In 2001, Anthony, as president of 72 East Walton Bakery, Inc., exercised the lease option to purchase the property. Following litigation, Anthony took title to the property on October 23, 2003. Anthony conveyed the property to Cedicci the same day by use of a pass-through arrangement under which Cedicci financed the $1.475 million purchase.

¶ 14    On April 28, 2004, Cedicci took out a $6 million construction loan from American Chartered Bank. Work commenced on the project. The warehouse and concrete pad were removed from the property, the site was excavated, a new water main was installed, and a foundation was poured. During construction of the building, Cedicci decided to use a less expensive structural system than that specified in the plans approved by the City.

¶ 15    In October 2004, a City inspector visited the property and issued a stop work order (SWO). On October 23, 2004, Raphael Hernandez, executive director of the City's department of construction and permits, issued a letter stating the permit was invalidated by a provision of the Chicago Building Code allowing revocation of permits for inactivity within six months of issuance (Chicago Municipal Code § 13-32-110 (2000)).

¶ 16    After receiving the SWO, Cedicci contacted John Quinn, who was then the City's chief of zoning inspectors. Quinn was terminated from that position in 2005. At the time of trial, Quinn was employed by Cedicci. However, in October 2004, Cedicci and Quinn had been social acquaintances for over a decade. The two men dined twice monthly on average, often at the Pine Caldo restaurant, which Anthony owned. When dining at Pine Caldo, Cedicci and his guests were not billed for their meals. When dining elsewhere, Quinn would buy meals for Cedicci.

¶ 17    After receiving Cedicci's telephone call, Quinn discussed the property with Hernandez, who said the construction was a "huge issue" in the area and that community groups and others were "up in arms" over it. According to Quinn, Hernandez said he would rely on the advice of the City's law department in deciding whether to reinstate the permit. Quinn advised Cedicci to hire an attorney.

¶ 18    Cedicci hired John Pikarski, an attorney specializing in zoning matters. On November 29, 2004, Pikarski wrote Hernandez, asserting a substantial amount of work had been performed on the property and there was no evidence JMC had abandoned the project. Pikarski also cited the funds expended in obtaining the permit, preparing the site, and partially constructing the building in reliance on the permit as reasons to reinstate the permit.

¶ 19    Pikarski's letter resulted in meetings involving various City departments, including

zoning, construction and permits, industrial development, and the law department. The officials involved reviewed photographs of the current state of construction on the property taken by the building department under the direction of First Deputy Commissioner Kimberly Brown. Chief Assistant Corporation Counsel Mardell Nereim testified that she discussed the "vested rights" doctrine in these meetings, but did not make a recommendation on its applicability in this situation. Nereim stated the permit was reinstated to avoid litigation. Quinn testified that Nereim had opined the City could not win a "vested rights" case in this situation. Hernandez testified the direction to reinstate the permit came from the law department and he was not influenced by anyone else.

¶ 20    After the officials decided to reinstate the permit, the discussion turned to concessions the City could obtain from Cedicci related to the reinstatement. The City decided to ask Cedicci for more landscaping in his plans. The City also sought the inclusion of language in Cedicci's sales contracts disclosing they were purchasing property in a PMD and waiving future claims based nuisance or similar causes of action. On January 6, 2005, Cedicci (on JMC letterhead) agreed to include the disclosure and waiver language in its sales contracts. On January 10, 2005, Hernandez reinstated the permit.

¶ 21    On March 27, 2005, a committee of organizations and individuals opposed to the project wrote to Hernandez and demanded the reasoning behind the reinstatement of the permit. On April 8, 2005, the same committee wrote the department of planning and development in opposition to any negotiated settlement to allow residential development on the property, stating industrial firms and property owners in the PMD were alarmed by the reinstatement of the permit. One group held a press conference opposing the project.

¶ 22    During a chance meeting in the spring of 2005, Hernandez told Quinn that City officials were attempting to blame him for reinstating the permit. Hernandez and Quinn agreed the permit was reinstated upon the recommendation of the law department. The City sought to have Cedicci modify the January 2005 agreement reinstating the permit or sell his rights in the property to the City. The City offered Cedicci $3.2 million for the property, but did not respond to Cedicci's $9 million counteroffer.

¶ 23    On June 1, 2005, a City building inspector visited the property and again issued a SWO. The inspector found a copy of the approved architectural plans were not on site, the contractor listed on the permit was not a licensed general contractor, there were no safety rails on the second floor, there was standing water in a crawl space, and the site was incompletely fenced. According to Pikarski, most of these issues could not be addressed because the police denied his client access to the property. Pikarski also wrote to a building department official that Cedicci had attempted to substitute BAC.CC, Inc., as a licensed general contractor, but City personnel refused to process the form.

¶ 24    On June 24, 2005, Hernandez advised JMC in writing that the permit was revoked. Pikarski demanded a basis for the revocation. On June 27, 2005, Hernandez wrote that the revocation was based on a recommendation from the City's office of the inspector general and pursuant to the requirements of the City of Chicago Zoning Ordinance. Pikarski wrote the inspector general and the City's zoning administrator for more definite reasons, but received no response.

¶ 25    The trial judge later found the recommendation from the City's office of the inspector general referred to an investigation commenced following the discovery that Quinn and Kimberly Brown had traveled with Cedicci and Anthony to Brazil in March 2005. Quinn reimbursed Cedicci for his expenses by a check dated May 19, 2005; Brown wrote a check to Anthony on August 17, 2005. Quinn, Brown and Timothy Hutchinson, deputy commissioner of the department of buildings, were terminated as a result of the investigation.

¶ 26    Following the revocation of the permit, on July 12, 2005, plaintiffs filed this lawsuit against the City and various City officials, seeking to compel the City to honor the building permit and to enjoin the City from enforcing its SWOs. Plaintiffs also requested a declaration that the 2005 agreement to reinstate the permit was enforceable. In its answer, the City asserted that plaintiffs had unclean hands and filed counterclaims, including two counts alleging plaintiffs and Anthony violated provisions of the Chicago Municipal Code regarding gifts over $50 made to City employees.

¶ 27    The case ultimately proceeded to a bench trial held between September 9, 2008, and September 16, 2008. On January 22, 2009, the trial court entered judgment for the City on plaintiffs' complaint and for plaintiffs and Anthony on the City's counterclaim on all counts. On February 19, 2009, plaintiffs were granted an extension of time to file a posttrial motion, which plaintiffs filed on March 20, 2009. On April 2, 2009, plaintiffs also filed a petition for fees and costs pursuant to Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994).

¶ 28    On April 3, 2009, the trial court denied plaintiffs' posttrial motion. On May 1, 2009, plaintiffs filed a notice of appeal to this court. On May 11, 2009, the City filed a cross-appeal. On December 8, 2009, the trial court denied plaintiffs' petition for fees and costs. On January 7, 2010, plaintiffs filed a notice of appeal to this court. On March 4, 2010, this court consolidated the appeals for review.

¶ 29                                    DISCUSSION

¶ 30    On appeal, plaintiffs argue the trial court erred in: (1) rejecting their claim that the City was equitably estopped from revoking the building permit; (2) rejecting their claim of vested rights in the permit; and (3) concluding the City could not be ordered to allow resumption of construction on the ground plaintiffs never submitted revised plans. The City claims that the judgment on its counterclaim should be reversed. Additionally, plaintiffs argue the trial court erred in denying their petition for fees and costs related to the City's counterclaim. We address these arguments in turn.

¶ 31                          I. Plaintiffs' Appeal on the Merits
¶ 32                               A. Equitable Estoppel
¶ 33    Plaintiffs first argue the City was equitably estopped from revoking the building permit. The doctrine of equitable estoppel is applicable to municipal bodies. *Kenny Construction Co. of Illinois v. Metropolitan Sanitary District of Greater Chicago*, 52 Ill. 2d 187, 197 (1971); *Patrick Engineering, Inc. v. City of Naperville*, 2011 IL App (2d) 100695, ¶ 33. However, courts do not favor applying the doctrine of equitable estoppel against a public body. *La Salle*

*National Trust, N.A. v. Village of Westmont*, 264 Ill. App. 3d 43, 64-65 (1994). When invoked against a governmental entity exercising its governmental functions, estoppel will only apply in extraordinary or compelling circumstances. *Zeitz v. Village of Glenview*, 304 Ill. App. 3d 586, 593-94 (1999). Courts will only invoke equitable estoppel against a public body "when it is necessary to prevent fraud and injustice." (Internal quotation marks omitted.) *Hawthorne Race Course, Inc. v. Illinois Racing Board*, 366 Ill. App. 3d 435, 446 (2006). A court will apply equitable estoppel against a municipality if the aggrieved party can establish: (1) the municipality affirmatively acted; (2) the affirmative act induced substantial reliance; and (3) the aggrieved party substantially changed its position as a result of its justifiable reliance. *Monat v. County of Cook*, 322 Ill. App. 3d 499, 509 (2001). The affirmative act that prompts a party's reliance generally must be an act of the public body itself, such as a legislative enactment, rather than the unauthorized acts of a ministerial officer or a ministerial misinterpretation. *Schivarelli v. Chicago Transit Authority*, 355 Ill. App. 3d 93, 103 (2005); *Hamwi v. Zollar*, 299 Ill. App. 3d 1088, 1095 (1998). The question of whether estoppel should be applied against a municipality in a particular case must be made on an individual basis, after considering all of the circumstances of the case. *Patrick Engineering, Inc. v. City of Naperville*, 2011 IL App (2d) 100695, ¶ 33; *Stahelin v. Board of Education, School District No. 4*, 87 Ill. App. 2d 28, 39 (1967). "If under all of the circumstances, the affirmative acts of the public body have created a situation where it would be inequitable and unjust to permit it to deny what it has done or permitted to be done, the doctrine of estoppel may be applied against it." *Id*. However, a finding of estoppel against a public body is disfavored and should be limited to those circumstances in which it would not defeat public policy. *Gorgees v. Daley*, 256 Ill. App. 3d 143, 147 (1993). The trial court's decision regarding equitable estoppel will not be disturbed on review unless it is against the manifest weight of the evidence (*Feiler v. Covenant Medical Center of Champaign-Urbana*, 232 Ill. App. 3d 1088, 1093 (1992)) or is based on a legal conclusion reviewable *de novo* (see *In re Marriage of Jungkans*, 364 Ill. App. 3d 582, 584 (2006)).

¶ 34    Plaintiffs maintain they acted in reliance on the assertions of the City's departments of law and construction and permits. However, the assertions of City officials are not an affirmative act of the public body itself. *Schivarelli*, 355 Ill. App. 3d at 103.

¶ 35    Plaintiffs also maintain they relied on the issuance of the building permit in 2000 and its 2005 reinstatement by Hernandez. Plaintiffs rely heavily on *Cities Service Oil Co. v. City of Des Plaines*, 21 Ill. 2d 157 (1961), a leading Illinois Supreme Court case on the doctrine of estoppel as applied to municipalities. In *Cities Service*, the plaintiff purchased property in the City of Des Plaines upon which it planned to build a gas station. The seller had obtained a building permit for its construction and the building commissioner approved the transfer of the permit to the plaintiff. About three weeks after construction began, the city halted the work and the mayor subsequently revoked the permit because the station would be less than 300 feet from a church, in violation of a zoning ordinance. By that time, the plaintiff had invested over $5,000 in the project and would have to expend over $1,000 more to remove the improvements. *Cities Service*, 21 Ill. 2d at 158-59.

¶ 36    The plaintiff had attempted to obtain copies of ordinances relating to service stations before it began building the station. However, the plaintiff received a copy of an outdated

ordinance. As a result, the plaintiff had no knowledge that its activity was in violation of the ordinance. Furthermore, evidence introduced at trial showed that the operation of a gasoline service station would not create a greater hazard to the health and safety of the public than other permitted uses of property in the vicinity. The circuit court held that the city was estopped from enforcing the ordinance, reasoning that construction was initiated by the plaintiff upon "affirmative action and apparent approval by the public authorities." *Cities Service*, 21 Ill. 2d at 159.

¶ 37    Our supreme court agreed. The court reasoned that while "the mere issuance of an unauthorized permit and reliance thereon to one's injury does not provide grounds for relief," the city essentially ratified the issuance of the permit to build a service station by failing to act to revoke the permit for seven months. *Id.* at 163. However, the court also emphasized that if a party is aware of an ordinance or makes no attempt to learn of the applicable ordinances, the issuance of a permit in violation thereof will not result in a finding that the city is estopped from revoking the permit. *Id.*

¶ 38    However, this case is distinguishable from *Cities Service*. In October 1997, an ordinance was introduced in the Chicago city council to create a PMD encompassing the property. The Chicago plan commission and the city council's committee on zoning sent notices to property owners within the proposed PMD and afforded them an opportunity to be heard on the issue. On April 1, 1998, the city council approved the creation of the PMD and an amendment to the City of Chicago Zoning Ordinance reclassifying the zoning within the PMD. Cedicci's application was not stamped as approved until May 3, 1999; the building permit was not issued until June 20, 2000. Although Cedicci denied knowledge of the PMD's creation, the project's original architect was aware of the pending ordinance amendment and testified about some urgency in obtaining a building permit application prior to its enactment. Given this record, the trial judge's finding that plaintiffs actually or constructively knew that residential development was prohibited in the PMD is not against the manifest weight of the evidence. Moreover, unlike *Cities Service*, there was not a seven-month delay in revoking the permit. Hernandez sent a letter to JMC revoking the permit during the same month the SWO was issued by a City inspector.

¶ 39    Plaintiffs note the permit was temporarily reinstated by Hernandez. Plaintiffs argue the reinstatement makes their case similar to *Hagee v. City of Evanston*, 91 Ill. App. 3d 729, 734 (1980). In *Hagee*:

"No action was taken to halt construction or revoke the building permit until seven months after the permit was issued. City officials knew of possible code and zoning violations at least five months prior to the appeal to Evanston's zoning board. In December, four months before any action was taken to revoke the building permit and halt construction, [William] Dettmer [the director of the department of inspections and permits] informed Hagee that construction could continue if the plans were revised to reflect compliance with the zoning code. Hagee rightfully relied on Dettmer's representations because Dettmer, as director of the department of inspections and permits, had final authority to interpret and enforce the zoning code and issue building permits. The revised plans were submitted to and approved by Evanston in February, 1979. Evanston admits to this fact in their brief." *Id.*

In this case, Hernandez may have had the power to reinstate a permit, but plaintiffs have not shown Hernandez had the power to reinstate a permit for a project that was manifestly not in compliance with the PMD zoning. Moreover, as the trial judge noted, the attempt by City officials to do by agreement that which could only be done by following the appropriate zoning procedure is not valid and would infringe on the legal rights of other property owners in the PMD. See *Ad-Ex, Inc. v. City of Chicago*, 207 Ill. App. 3d 163, 175 (1990).

¶ 40    If a municipality were held bound through equitable estoppel by the unauthorized acts of governmental employees, the municipality would remain helpless to remedy errors and be forced to permit violations to remain in perpetuity. *Kaloo v. Zoning Board of Appeals*, 274 Ill. App. 3d 927, 931 (1995); *Hamwi v. Zollar*, 299 Ill. App. 3d 1088, 1095-96 (1998); *Chicago v. Unit One Corp.*, 218 Ill. App. 3d 242, 246 (1991); *Lake Shore Riding Academy, Inc. v. Daley*, 38 Ill. App. 3d 1000, 1003 (1976). This rule generally applies even where the municipality has issued repeated permits. *Unit One Corp.*, 218 Ill. App. 3d at 246. Moreover, unlike *Hagee*, the record here is not one of municipal inaction. See *Hagee*, 91 Ill. App. 3d at 734. In this case, after the permit was reinstated, the City sought to have Cedicci modify the January 2005 agreement or sell his rights in the property to the City. Furthermore, the trial judge heard testimony about the public policy furthered by the creation of PMDs, which would be frustrated by the continuance of plaintiffs' project on the property.

¶ 41    Given this record, the trial judge's finding that the City was not equitably estopped from revoking the reinstated permit was not against the manifest of the evidence. We conclude the trial judge did not err in rejecting plaintiffs' claim of equitable estoppel.

¶ 42                               B. Vested Rights

¶ 43    Plaintiffs next contend the trial court erred in rejecting their claim for *mandamus*, arguing they have vested rights in the permit. "*Mandamus* is an extraordinary remedy appropriate to enforce the performance of official duties by a public officer where no exercise of discretion is involved." *1350 Lake Shore Associates v. Healey*, 223 Ill. 2d 607, 614 (2006). "There must be a clear right to the relief requested, a clear duty in the public officer to act, and a clear authority in the officer to comply with the writ." *Id.* A decision to grant or deny *mandamus* will not be reversed on appeal unless it is against the manifest weight of the evidence, but we review conclusions of law *de novo*. *Id.*

¶ 44    "The general rule is that a landowner has no right to the continuation of an existing zoning classification." *Id.* at 615. However, there is an exception to this rule, referred to as the "vested rights" doctrine, which our supreme court has described as:

" '[W]here there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance, such party has a vested property right and he may complete the construction and use of the premises for the purposes originally authorized, irrespective of subsequent zoning or a change in zoning classification.' " *Id.* (quoting *People ex rel. Skokie Town House Builders, Inc. v. Village of Morton Grove*, 16 Ill. 2d 183, 191 (1959)).

There is no bright-line rule for determining whether expenditures have been made in good-

faith reliance, but expenses are not incurred in good faith if a property owner has knowledge or notice of the proposed zoning change. *Ropiy v. Hernandez*, 363 Ill. App. 3d 47, 52 (2005) (and cases cited therein). A property owner does not gain a vested right to build under the existing zoning classification merely by applying for a building permit where a zoning ordinance was under consideration by the municipality on which public hearings were being held. See *Chicago Title & Trust Co. v. Village of Palatine*, 22 Ill. App. 2d 264, 270 (1959), *cited with approval in Healey*, 223 Ill. 2d at 622.

¶ 45       We note, as the trial judge did, that this is not a vested rights case as the doctrine is generally understood. The parties acknowledge in their briefs that the typical vested rights case involves a property owner seeking to proceed on a permit despite a subsequent change or proposed change to the zoning ordinance existing when the permit was issued. In this case, plaintiffs seek to proceed on a building permit issued after the zoning ordinance was already amended in a manner that would bar their project.

¶ 46       Application of the vested rights doctrine presupposes issuance of a *legal* building permit and a substantial change of position incurred in good-faith reliance thereon by the property owner. *Ganley v. City of Chicago*, 18 Ill. App. 3d 248, 254 (1974); *City of Chicago v. Zellers*, 64 Ill. App. 2d 24, 29 (1965) (citing *Fifteen Fifty North State Building Corp. v. City of Chicago*, 15 Ill. 2d 408, 417 (1958)). Similarly, "[a] probability that approval is forthcoming exists when the property at issue is zoned to permit the use requested by the landowner." *Bank of Waukegan v. Village of Vernon Hills*, 254 Ill. App. 3d 24, 31 (1993). In *Bank of Waukegan*, land developers entered into a contract to purchase property with the intention of building apartments. Although the property had at one time permitted multifamily residential use, when the contract was signed, that use was no longer permitted. *Id.* at 26. This court affirmed the trial court's finding that the developers had no vested right to build apartments on the property because such use was not permitted under the zoning code that was in effect when the developers entered into the contract. *Id.* at 31.

¶ 47       In this case, the building permit was issued years after the zoning ordinance was amended to provide for a PMD barring residential development. As noted previously, the trial court's findings that plaintiffs had actual or constructive notice of the proposed zoning change when they submitted their application and that residential development was prohibited in the PMD are not against the manifest weight of the evidence. In addition, the building permit itself informed plaintiffs it may be revoked for the violation of any applicable ordinance. Given this record, we cannot conclude the trial court erred in ruling that plaintiffs could not show they had vested rights based on the issuance of the building permit.

¶ 48       Thus, plaintiffs' vested rights claim, if any, must rely on expenditures made prior to receiving actual or constructive notice of the proposed zoning change. Plaintiffs claim to have spent $20,000 paying the architects to prepare the plans prior to submitting the building permit application. Although plaintiffs knew or should have known it was unlikely their plans would conform to the proposed zoning change, they may not have had such notice for most of the period during which the plans were prepared. Assuming *arguendo* such expenditures were made in good-faith reliance on the previous C-2 zoning classification, the issue is whether the expenditures amount to a substantial change in position warranting the conclusion that plaintiffs had vested rights in obtaining the building permit.

¶ 49    The *Healey* court recently addressed the substantiality requirement:

"Whether a change of position is substantial depends on the facts of each case. It is not possible to properly make this determination by considering only the objective amount of expenditures in a vacuum. Necessarily, then, one must consider not only the amount of expenditures, but also factors that make each case unique. One of these factors is, as the appellate court held, the projected cost of the development. Other factors, such as the nature or character of the person or entity seeking to develop the property and the cost of the land are also appropriate considerations in deciding whether expenditures are substantial. There may, as well, be other factors in individual cases that a court may properly consider. None of these factors should be viewed in isolation; rather, as the appellate court noted, it is the totality of the circumstances that will determine whether expenditures in any given case are deemed to be substantial." *Healey*, 223 Ill. 2d at 626-27.

¶ 50    In this case, the $20,000 paid to the architects constitutes one-third of one percent of the $6 million loan that was to be used to finance the project. The expenditure cannot be considered substantial. *1350 Lake Shore Associates v. Randall*, 401 Ill. App. 3d 96, 106 (2010). Cedicci paid $1.475 million for the land, but not until 2003, when the property was already part of the PMD. Plaintiffs point to nothing about their nature or character of the plaintiffs or their proposed property usage weighing in favor of finding they substantially changed their position prior to the proposal to create the PMD. Accordingly, we conclude plaintiffs fail to show the circuit court erred in rejecting their claim of vested rights.

¶ 51                                   C. Revised Plans

¶ 52    Moreover, plaintiffs argue the trial judge erred in finding they never submitted revised plans, causing the trial judge to erroneously conclude the City could not be ordered to allow construction to resume. The trial judge's finding occurs in a paragraph of her order noting that the fact that the building plaintiffs were constructing when the permit was revoked was not the building approved by the City further undermined plaintiffs' claims for equitable relief. This was not an independent ground for the trial court's judgment. As noted previously, plaintiffs' claims of equitable estoppel and vested rights fail regardless of whether plaintiffs attempted to submit revised plans to the City after the permit was revoked. Thus, it is unnecessary for this court to review the finding on appeal. Indeed, plaintiffs' brief on this point fails to provide any explanation of how the claimed error would mandate reversal. Instead, this portion of plaintiffs' brief continues to argue about plaintiffs' expenditures and the trial judge's reliance on *Ad-Ex*, 207 Ill. App. 3d at 175, both of which this court has already addressed, and neither of which is related to the plaintiffs' attack.

¶ 53                              II. The City's Counterclaim

¶ 54    On cross-appeal, the City argues the trial court erred in ruling against the City's counterclaim that plaintiffs violated the City's ethics ordinance. Section 2-156-040 of the Chicago Municipal Code (Code) provides in relevant part:

"(b) No person shall give or offer to give to any official, employee or city contractor,

or to the spouse, domestic partner, minor child of any of them, or any immediate family member residing in the same residence with the official or employee, and none of them shall accept, anything of value, including, but not limited to, a gift, favor or promise of future employment, based upon any mutual understanding, either explicit or implicit, that the votes, official actions, decisions or judgments of any official, employee or city contractor, concerning the business of the city would be influenced thereby. It shall be presumed that a nonmonetary gift having a value of less than $50.00 does not involve such an understanding.

(c) No person who has an economic interest in a specific city business, service or regulatory transaction shall give, directly or indirectly, to any city official or employee whose decision or action may substantially affect such transaction, or to the spouse, domestic partner, or minor child of such official or employee, or any immediate family member residing in the same residence with the official or employee, and none of them shall accept, any gift of (i) cash or its equivalent regardless of value, or (ii) an item or service other than a gift with a value of less than $50.00, as long as the items or services from any one source do not exceed a cumulative value of $100.00 during any calendar year. Nothing herein shall be construed to prohibit such person from accepting gifts from relatives or from one's own domestic partner." Chicago Municipal Code § 2-156-040(b), (c) (amended July 28, 2011).

"Municipal ordinances are interpreted under the rules governing statutory interpretation." *DTCT, Inc. v. City of Chicago Department of Revenue*, 407 Ill. App. 3d 945, 949 (2011). The interpretation of an ordinance is a question of law and the reviewing court applies the *de novo* standard of review. *Id*. at 948. The court must give effect to the intent of the municipality by first interpreting the plain language of the ordinance. *Id*. at 949. The reviewing court will not resort to extrinsic aids of construction if the language is clear and unambiguous. *Id*. However, as the City acknowledges, the standard of review for factual findings in a bench trial is whether the court's judgment is contrary to the manifest weight of the evidence. See *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995); *First Baptist Church of Lombard v. Toll Highway Authority*, 301 Ill. App. 3d 533, 542 (1998). A judgment is against the manifest weight of the evidence "if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006) (citing *In re D.F.*, 201 Ill. 2d 476, 498 (2002)).

¶ 55    In this case, the City's theory at trial was that the Brazil trip was Cedicci's way of repaying Brown and Quinn for their help in reinstating the building permit and part of a larger pattern of Cedicci and Anthony wining and dining City officials to influence their conduct. The trial judge rejected the City's theory, concluding: (1) the uncontradicted evidence showed the permit was reinstated based on the advice of the law department; (2) the City failed to prove any relationship between the trip and Quinn and Brown's official duties; and (3) the evidence showed Anthony treated Quinn and Brown to meals of unspecified value, but the City adduced no proof that Anthony retained a financial interest in the project after selling the property to Cedicci. On appeal, the City argues: (1) the law applies to more than the final decision to reinstate the permit; (2) Quinn and Brown both sought to facilitate reinstatement of the permit; (3) the timing of the Brazil trip was evidence

-12-

the trip was connected to official business; (4) the ongoing relationship between Cedicci and Quinn allowed the inference Quinn and Brown would continue to be "richly rewarded" for advancing Cedicci's interests.

¶ 56 "In Illinois, the law is well established that the trial judge, sitting without a jury, has the obligation of weighing the evidence and making findings of fact." (Internal quotation marks omitted.) *Dobbs v. Wiggins*, 401 Ill. App. 3d 367, 375 (2010) (quoting *Chicago Investment Corp. v. Dolins*, 107 Ill. 2d 120, 124 (1985)). The trial judge found Quinn and Brown learned of the Brazil trip in February 2005, the month after the permit was reinstated. Assuming *arguendo* that the City's broad reading of the ordinance is correct, the City would still be required to prove the mutual understanding existed prior to the official action.

¶ 57 The City suggests the trip could have been a "down payment" for future efforts by Quinn or Brown, but cites no evidence supporting this theory. The City also suggests the free meals establish the mutual understanding. However, the evidence adduced at trial showed that Cedicci and Quinn had a longstanding social acquaintance, with Quinn purchasing Cedicci's meals when they dined places other than at Anthony's restaurant. Moreover, the City's amended counterclaims do not refer to the meals or claim the meals as violating either subsection of the ordinance. Lastly, the City argues the advance payment for the Brazil trip is a gift violating the ethics ordinance in the Code (Chicago Municipal Code § 2-156-040(c) (amended July 28, 2011)), but points to no evidence that the value of the alleged gift, *e.g.*, interest earned by Quinn or Brown on funds before repaying Cedicci, exceeded $50. Given this record, we cannot conclude the trial court's ruling on the City's counterclaims was against the manifest weight of the evidence.

¶ 58                                    III. Sanctions

¶ 59 Finally, plaintiffs argue the trial court erred in rejecting their petition for costs and fees based on the City's alleged violation of Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994), which provides in pertinent part:

> "Every pleading, motion and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. *** The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. *** If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorney fee."

"The purpose of Rule 137 is to prevent parties from abusing the judicial process by imposing sanctions on litigants who file vexatious and harassing actions based upon unsupported

allegations of fact or law." *Dismuke v. Rand Cook Auto Sales, Inc.*, 378 Ill. App. 3d 214, 217 (2007). Since Rule 137 is penal in nature, it will be strictly construed. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 487 (1998). "Courts should use an objective standard in determining what was reasonable under the circumstances as they existed at the time of filing." *Sanchez v. City of Chicago*, 352 Ill. App. 3d 1015, 1020 (2004). However, to award sanctions for a needless increase in the cost of litigation, there must be subjective bad faith. *People v. Stefanski*, 377 Ill. App. 3d 548, 552 (2007).

¶ 60    A trial court's decision imposing sanctions is entitled to deference and will not be reversed absent an abuse of discretion. *In re Estate of Baker*, 242 Ill. App. 3d 684, 687 (1993). An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view. *People v. Ortega*, 209 Ill. 2d 354, 359 (2004); *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 61    Plaintiffs argue the City's counterclaims were demonstrably false because the City knew the permit was reinstated by Hernandez upon the advice of the Law Department, not by Quinn or Brown. However, as the City notes, the language of the ordinance is quite broad, applying to gifts given to any official with the mutual understanding the official action of any official would be influenced. Chicago Municipal Code § 2-156-040(b) (amended July 28, 2011). On its face, the ordinance does not require that the official receiving the gift be the same official whose acts are influenced. When the counterclaims were filed, the City could have alleged Cedicci or Anthony violated the ordinance on the theory that gifts to Quinn and Brown were intended to influence other officials and their official decisions, even if the City was ultimately unable to convince the trier of fact on this point. Plaintiffs discuss the City's assertion of attorney-client privilege regarding Nereim (ultimately forfeited at trial), but the pretrial assertion of the privilege does not affect the City's basic theory at trial. We note that plaintiffs repeatedly assert that Nereim opined plaintiffs had vested rights on the property, when the evidence at trial shows this to be a disputed point.

¶ 62    Plaintiffs complain the City named Joanna Cedicci as a third-party defendant in the counterclaim, but made no attempt to prove wrongful conduct on her part at trial. The City correctly notes its civil conspiracy claim against Joanna, based on her designation as a corporate officer or agent for several of Cedicci's businesses, was voluntarily dismissed well before trial.

¶ 63    Plaintiffs also complain that the City pursued its case with "inappropriate zeal," but the premise of this complaint was that the City did not need to depose so many people when it knew the law department had advised the permit be reinstated. However, the City was entitled to pursue a claim that Quinn and Brown indirectly influenced the reinstatement of the permit.

¶ 64    Lastly, plaintiffs assert the City pursued large numbers of meritless and harassing motions. However, plaintiffs refer to only three such motions and devote no argument to showing they were made without a reasonable basis, thereby forfeiting the argument on appeal. Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006) (points not argued are waived). In sum, plaintiffs have failed to show the trial court abused its discretion in denying their Rule 137 petition.

¶ 65                               CONCLUSION

¶ 66      In short, we find the trial court's rejection of plaintiffs' claims that the City was equitably estopped to revoke the building permit and that plaintiffs had vested rights in the issuance of the permit was not erroneous as a matter of law or against the manifest weight of the evidence. The City failed to show the trial court's rejection of their counterclaims that plaintiffs violated the City's ethics laws was against the manifest weight of the evidence. Lastly, plaintiffs failed to show the trial court abused its discretion in denying their Rule 137 petition for sanctions. For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 67      Affirmed.

¶ 68      JUSTICE MURPHY, specially concurring.

¶ 69      I concur in the court's decision, but write separately to question why the parties did not attempt to seek out a third party to settle this case. Such parties are becoming an increasingly large part of our legal system. Trial court judges help settle many cases. The legal publications are full of advertisements with offers to moderate and/or arbitrate cases. In addition, this court could have made itself available to help settle the case pursuant to Illinois Supreme Court Rule 310 (eff. Aug. 1, 1989) or 310.1 (eff. Jan. 1, 2005). The appellate court mediation service has provided help in settling many cases. Prior to trial, the City offered appellant $3.2 million for the property and appellant made a counteroffer asking for $9 million. At oral argument, counsel for the City said that the $9 million offer by appellant was inflated and could not be justified. A neutral party could have been asked to determine appellant's actual loss.