# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

*Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148

---

| | |
|---|---|
| Caption in Supreme Court: | PATRICK ENGINEERING, INC., Appellee, v. THE CITY OF NAPERVILLE, Appellant. |
| Docket No. | 113148 |
| Filed | September 20, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The doctrine of equitable estoppel could not be applied against a municipality where a plaintiff claiming reliance in seeking to recover in a contract dispute alleged only the apparent authority of city employees, rather than specific facts showing their express authority—complaint counts properly dismissed. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Du Page County, the Hon. John T. Elsner, Judge, presiding. |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment affirmed.<br>Cause remanded. |

Counsel on
Appeal

Margo Ely, Patricia Johnson Lord and Mark Antonio Scarlato, of Naperville, for appellant.

Phillip A. Luetkehans and Robert W. Funk, of Schirott, Luetkehans & Garner, P.C., of Itasca, for appellee.

Michael J. Sturino, of Itasca, for *amicus curiae* Illinois Road and Transportation Builders Association.


Justices

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Karmeier, and Burke concurred in the judgment and opinion

**OPINION**

¶ 1     This case involves an agreement between Patrick Engineering, Inc., and the City of Naperville for a stormwater management system. When the City refused to pay Patrick Engineering, Patrick Engineering terminated the agreement and sued the City. The trial court dismissed Patrick Engineering's third and fourth amended complaints, and the appellate court reversed and remanded for further proceedings. 2011 IL App (2d) 100695.

¶ 2     The primary issue before us, according to the City, is whether the doctrine of equitable estoppel may apply against a municipality based upon the alleged apparent authority of its employees. We hold that equitable estoppel does not apply against a municipality when a plaintiff has alleged that a municipal official possessed apparent authority, but only when a plaintiff has alleged specific facts to show that a municipal official possessed express authority and that the plaintiff reasonably relied upon statements or conduct by the official. For the reasons that follow, we reverse and remand for further proceedings.


¶ 3                            BACKGROUND

¶ 4     In early 2007, the City had partially completed a project to manage its stormwater, and accepted bids to finish it. The City, through its department of public works, its transportation, engineering and development business group, and its information technology department, published a "General Scope of Services" for interested vendors. According to the City, the remaining work included a "Stormwater Needs Analysis" for the entire city, as well as several tasks in a 23.5-square-mile area called Area B, which would begin with data collection and conversion for a three-square-mile "pilot area" selected by the City. The City notified vendors that the pilot area data collection and "any required process changes" would have to be completed and accepted by the City before proceeding with the data collection and

-2-

conversion in Area B. The City offered vendors a worksheet on which they could list proposed costs for the various areas of the project. Patrick Engineering completed and submitted the worksheet as part of its bid. This table shows Patrick Engineering's proposed cost for each project area, as well as its total proposed cost:

| Project Area | Proposed Cost |
|---|---|
| Project Management | $44,432 |
| Stormwater Needs Analysis | $35,580 |
| Pilot Area Data Conversion | $73,420 |
| Area B Data Conversion | $244,306 |
| Software Configuration | $37,454 |
| Other Costs | $1,200 |
| TOTAL | $436,392 |

The City accepted Patrick Engineering's offer, and on March 29, 2007, the parties signed a "Consultant Services Agreement." Patrick Engineering agreed to provide the City with a "Stormwater Asset Management and GIS Information System," and in return the City agreed to pay Patrick Engineering $436,392.

¶ 5    Section 2.1 of the agreement provided a procedure under which the City could request and authorize "Additional Services" beyond those listed in the scope of services:

"If the representative of the City responsible for the Project verbally requests [Patrick Engineering] to perform additional services, [Patrick Engineering] shall confirm in writing that the services have been requested and that such services are additional services. [Patrick Engineering] shall be under no obligation to provide said services until a period of thirty (30) days has elapsed or until the City has authorized those services in writing, whichever is earlier. Failure of the City to respond to [Patrick Engineering's] confirmation of said services within thirty (30) calendar days of receipt of the notice shall be deemed rejection of, and refusal to pay for the Additional Services."

¶ 6    Shortly after the parties signed the agreement, the City asked Patrick Engineering what additional services would cost. On April 2, 2007, Patrick Engineering's manager of enterprise solutions, Michael Blalock, wrote a letter to Debbie Kresl, a City employee, outlining the "cost per feature," which would be used if the City decided "to create a change order." No change order was made at that time.

¶ 7    Several weeks later, Blalock and Kresl exchanged emails regarding the project. On April 20, 2007, Blalock told Kresl that Patrick Engineering wanted to begin its work, and asked her for a purchase order from which he could generate invoices for the City. Kresl asked him for a list of tasks that Patrick Engineering would start because her superiors likely would demand more details. She explained why a purchase order was necessary, and referred to "sign off and reviews" within the City decisionmaking process. She stated, "I realize that we need to get started ASAP and am working through the various internal steps to expedite the

Notice to Proceed. I have queried the appropriate folks within our organization and have asked if I can give the okay to start ***. *** I am awaiting a response from the Finance Director."

¶ 8 That response came quickly. On April 23, 2007, Kresl sent a message to Blalock: "Please take this e-mail as limited 'Notice to Proceed' with work related to the 'Field Data Collection and Conversion of Area B.' I have spoken with Mike Bevis, Purchasing Manager, and he authorized the limited Notice to Proceed." Although the City instructed Patrick Engineering to proceed generally in Area B, Kresl added, "I am also working to identify preliminary 1 square mile areas, to select from, for the 3 square mile pilot area." Shortly thereafter, the City issued a purchase order, and Patrick Engineering began its work under the contract.

¶ 9 On July 3, 2007, Patrick Engineering delivered the stormwater needs analysis to the City. On July 17, Patrick Engineering's project manager, Scott Stocking, met with Beth Lang, the strategic services manager for the City's department of public works, and informed her that the "feature count" under the contract would be reached before Patrick Engineering completed its work, and that a change order would be necessary. On July 23, Stocking sent a follow-up email to Lang reiterating Patrick Engineering's belief that the City would need to issue a change order. The City notified Patrick Engineering that it would not do so, and Patrick Engineering stopped its work.

¶ 10 On August 10, 2007, Lang sent a letter to Stocking. Lang stated that City representatives had reviewed Stocking's email, as well as the agreement and its attachments. Lang further stated that the City's worksheet had instructed vendors to include all costs for data collection and conversion in the pilot area. According to Lang, "given the accepted contract language for the pilot area," the City would pay only the amount specified in the agreement for Patrick Engineering's work there. Lang requested that Patrick Engineering resume its work on the pilot area and complete that work within a month. She continued:

> "Upon delivery and review of the pilot data, the City will work with Patrick to determine if a change in scope to complete the remainder of Area B is required. At that time, the project specifications, feature count projections, and budget will undergo thorough review and any necessary changes will be made.
>
> Please note, until the pilot area receives formal acceptance by the City, work performed in the remainder of Area B without prior authorization from the city's assigned Project Manager is at your own risk."

The letter did not identify the project manager, but it was copied to several city officials, including "Debbie Kresl, Technology Project Manager."

¶ 11 Patrick Engineering returned to work. Between May 2007 and September 2008, Patrick Engineering sent five invoices to the City. This table shows the dates and amounts of these invoices:

| Invoice Date | Invoice Amount |
| --- | --- |
| May 31, 2007 | $6,910 |
| September 5, 2007 | $136,326.10 |
| February 6, 2008 | $259,232.67 |
| May 22, 2008 | $12,253.40 |
| September 9, 2008 | $21,660.66 |

This table shows Patrick Engineering's proposed cost and invoiced amount for each project area, as well as its total proposed cost and total invoiced amount:

| Project Area | Proposed Cost | Invoiced Amount |
| --- | --- | --- |
| Project Management | $44,432 | $60,047.67[1] |
| Stormwater Needs Analysis | $35,580 | $59,184.66 |
| Pilot Area Data Conversion | $73,420 | $115,884.50 |
| Area B Data Conversion | $244,306 | $166.079.50 |
| Software Configuration | $37,454 | $37,868.60 |
| Other Costs | $1,200 | $1,500 |
| TOTAL | $436,392 | $436,382.83 |

¶ 12    Patrick Engineering invoiced an amount within $10 of the amount of the entire agreement, exceeding its proposed cost in every project area, except Area B data conversion, where it invoiced only 68% of its proposed cost. Clearly, the project remained substantially unfinished. At some point, the City paid $77,312.20, though that is not reflected in any of the five invoices. Patrick Engineering demanded full payment of the balance, and the City declined. On January 21, 2009, Patrick Engineering's attorney sent a letter to the City terminating the agreement.[2]

¶ 13    On January 27, 2009, Patrick Engineering filed a three-count complaint against the City. In count I of its original complaint, entitled "Breach of Contract," Patrick Engineering stated that the agreement obligated the City to pay $436,392. Patrick Engineering alleged that the City required additional plans and additional categories of plans should be included in the data to be converted, provided improperly catalogued plans and incomplete "as-built" drawings, and changed the size of Area B. However, Patrick Engineering did not allege

---

[1]$17,212 of this amount was finance costs. The invoices each stated, "A finance charge of 1.5% per month will be assessed on accounts over 30 days," but the agreement did not provide for finance charges. Notably, Patrick Engineering only imposed a finance charge on the third invoice, and then only in the area of project management.

[2]Section 6.1 of the agreement provided, "This agreement may be terminated at any time upon thirty (30) days written notice by either party in the event of a substantial failure to perform in accordance with the terms hereof by the other party through no fault of the terminating party."

which City official or officials made those modifications, or whether that official or those officials possessed the authority to do so. More importantly, Patrick Engineering did not allege that any City official authorized in writing additional services, as required by section 2.1. Patrick Engineering simply stated that it incurred $231,848.36 in additional costs, and performed $457,731.62 of services under the agreement. Because the City paid only $77,312.20, Patrick Engineering claimed that it was due $380,419.42.

¶ 14        In count II, entitled "Account Stated," Patrick Engineering listed the five invoices that it sent to the City. The amounts are correct for four of the invoices. Regarding the third invoice, Patrick Engineering stated that it billed the City $242,020, when it had actually billed the City $259,232.67.[3] Patrick Engineering did not provide a total of the amounts it purportedly invoiced, or acknowledge that the City paid $77,312.20, as it had in count I. Instead, Patrick Engineering claimed that because the City never objected to the invoices, an account stated in the amount of $341,857.96 was warranted. In count III, entitled "Local Government Prompt Payments Act," Patrick Engineering incorporated the allegations of count II, and further alleged that that statute (50 ILCS 505/1 *et seq.* (West 2010)) required the City to approve or disapprove of the invoices within 30 days. Patrick Engineering stated that because the City did not do so, it owed $341,857.96, the amount of the unpaid services, plus statutory interest of 1% per month. Patrick Engineering did not explain the discrepancy between the amount it claimed in count I and the amounts it claimed in counts II and III. Patrick Engineering also did not explain the discrepancy between the amount it claimed in counts II and III, $341,857.96, and the amount it actually invoiced, $436,382.83.[4]

¶ 15        The trial court dismissed the complaint without prejudice. Over the following year, Patrick Engineering filed four amended complaints, each of which the trial court dismissed. The doctrine of equitable estoppel appeared as an issue in this case for the first time when the City mentioned it briefly, and preemptively, in its motion to dismiss Patrick Engineering's second amended complaint. The City argued that a municipal agent cannot approve a contract modification without explicit authority, and in the absence of such authority, the modification is void and cannot be validated by estoppel. The trial court agreed with the City, and after that complaint was dismissed, equitable estoppel became the crux of Patrick Engineering's case.

¶ 16        On November 30, 2009, Patrick Engineering filed its third amended complaint. That complaint contained five counts, but only three of those counts are at issue here. In count I, entitled "Breach of Contract," Patrick Engineering stated that the agreement obligated the City to pay $436,392, then chronologically addressed its dealings with City officials. Patrick Engineering mentioned Blalock's letter to Kresl, whom Patrick Engineering described as the "Project Manager for Naperville's Transportation and Traffic Engineering Department,"

---

[3]The difference between the alleged and actual amounts, $17,212.67, was equal to the finance charge that Patrick Engineering imposed in that invoice for project management.

[4]In its brief before us, Patrick Engineering states that it invoiced "a total of $457,731.62 for its work." That figure is consistent with the amount it claimed in count I of its original complaint, but not with the invoices themselves.

regarding the costs of additional services, as well as Kresl's email to Blalock regarding the limited notice to proceed from Bevis. Patrick Engineering also mentioned Stocking's meeting with Lang, where he informed the City that the feature count under the agreement would be reached and that a change order would be necessary, "as outlined in" Blalock's letter to Kresl. However, Blalock's letter, which was attached as an exhibit to the complaint, did not sketch the parameters of a change order. He simply provided prices for various features that the City could use in considering whether to request and authorize additional services. In fact, when he wrote the letter, Patrick Engineering had not begun its work, and the City had not requested additional services.

¶ 17       Patrick Engineering then alleged that after it stopped its work, Lang wrote a letter representing that "upon Patrick Engineering's delivery of the Pilot Area data, Naperville would make any necessary adjustments to the budget and project specifications." Lang's letter, which was also attached as an exhibit to the complaint, did not promise that the City would alter the project's scope of services and budget once Patrick Engineering delivered the pilot area data. She advised only that the City would review the data to determine if a change in the project's scope or budget was required. Lang also warned that before the City formally accepted the pilot area data, any work in Area B without prior authorization from the City's project manager would be at Patrick Engineering's own risk. Despite the actual language of Lang's letter, Patrick Engineering stated that it resumed its work based on her assurances that the City "would make any necessary adjustments to the Project budget." Patrick Engineering also stated that sometime during the "latter half" of 2007, City representatives, including Lang and Larry Gunderson, the City's information technology team leader, informed Patrick Engineering employees that "the City would issue a change order once the Pilot Area [data] was accepted."

¶ 18       Patrick Engineering then turned to "additional work," presumably meaning work beyond the agreement's scope of services. Patrick Engineering alleged that in early 2008, Bevis, who earlier had authorized the limited notice to proceed, and William Novack, the city engineer and its engineering services team leader, "were aware" of the additional work Patrick Engineering was performing "as a result of [the City's] representations." Patrick Engineering stated that in February 2008, its vice presidents, Ernst Kohn and Jeffrey Schuh, met with Novack to discuss the fact that Patrick Engineering was performing additional work at the City's direction. During that meeting Kohn and Schuh showed Novack a letter written by Patrick Engineering's president, Dan Dietzler, to Robert Marshall, the acting city manager, which outlined the additional work Patrick Engineering was performing. Unlike Blalock's letter, Dietzler's letter was not attached to the complaint and does not appear in the record. Patrick Engineering asserted that Bevis, Novack, and Marshall knew Patrick Engineering was performing additional work, but never instructed Patrick Engineering to stop. Patrick Engineering continued,

> "In light of Patrick's knowledge that Beavis [*sic*], Marshall, and Novack knew of Patrick's additional work, Patrick reasonably relied on the representations of Lang and Gunderson that adjustments would be made to the Project budget and, most particularly, to the amounts that would be paid to Patrick, and directed its employees to continue working on the Project, thereby incurring hundreds of thousands of

-7-

dollars in labor costs."

¶ 19    Patrick Engineering then referred to section 2 of the agreement, which purportedly contemplated that Patrick Engineering "may provide additional services as requested" by the City. This allegation oversimplified section 2.1. Under that section, if the City made a verbal request for additional services, Patrick was required to confirm that request in writing, and was not obligated to perform those services until the City authorized them in writing. Patrick Engineering did not assert that the City did that, but did assert that the City made changes and additions to Patrick Engineering's work under the agreement pursuant to section 2. As it had in its original complaint, Patrick Engineering alleged that the City required additional plans and additional categories of plans should be included in the data to be converted, provided improperly catalogued plans and incomplete "as-built" drawings, and changed the size of Area B. But again Patrick Engineering did not allege which City official or officials made those modifications, or whether that official or those officials possessed the authority to do so. Patrick Engineering simply stated that it performed what it called "the Extras" in reasonable reliance on representations made by Lang and Gunderson that the City "would adjust the Project budget and issue appropriate change orders upon delivery of the Pilot Area data."

¶ 20    Patrick Engineering then briefly listed the work it performed pursuant to the agreement, and alleged that it managed the project and incurred related costs, performed and delivered a stormwater needs analysis, performed and delivered pilot area data conversion, converted data in Area B, and configured and implemented software. According to Patrick Engineering, the City refused to issue a change order upon delivery of the pilot area data, contrary to the representations from Lang and Gunderson. Patrick Engineering asserted that "[a]s a result of Patrick's performance of the Agreement, including the Extras," the City was required to pay $341,475.26. Because the City paid only $77,312.20, Patrick Engineering claimed that it was due $264,163.06. Patrick Engineering concluded: "Based on Naperville's changes to the Agreement and the representations of its agents, Naperville is equitably estopped from denying liability for the work performed pursuant to the agreement, including, but not limited to, the Extras."

¶ 21    In count II, also entitled "Breach of Contract," Patrick Engineering incorporated the allegations of count I and added more. Patrick Engineering asserted that it completed and submitted the pilot area data to the City, in compliance with the standards of the agreement, but the City "without right or justification, refused to accept the [data] and imposed standards and rules not contained in the Agreement and in breach of the Agreement." Patrick Engineering did not allege which City official or officials declined the data and changed the rules, or whether that official or those officials had the authority to do so. Patrick Engineering simply alleged that, in an effort to comply with the City's new standards, it incurred costs of $116,256.36 related to the pilot area. Patrick Engineering did not explain why its work in the pilot area was the subject of a separate count, even though that work fell within the scope of services and had been included in count I among the work it purportedly performed pursuant to the agreement. Patrick Engineering concluded that, based on the changes and the representations of its agents, the City was equitably estopped from denying liability for these costs. Together, counts I and II sought $457,731.62, the same amount as

-8-

count I of Patrick Engineering's original complaint.

¶ 22    In count IV, entitled "Accounts Stated," Patrick Engineering tracked count II of its original complaint, and used the incorrect figure for the third invoice. Again, Patrick Engineering claimed that it was due $341,857.96.[5]

¶ 23    The City filed a combined motion to dismiss this complaint under section 2-619.1 of the Code of Civil Procedure. See 735 ILCS 5/2-619.1 (West 2010). The City argued that counts I and II should be dismissed under section 2-619 (735 ILCS 5/21-619 (West 2010)), and that count IV should be dismissed under section 2-615 (735 ILCS 5/2-615 (West 2010)). During the status hearing to set the briefing schedule on the City's motion, the parties stipulated orally that Patrick Engineering performed additional work, and that City representatives in the building department knew of this additional work, but did not halt it. On March 17, 2010, the trial court granted the City's motion in a written order. Relevant to counts I and II, the court noted the parties concurred that the third amended complaint "does not attempt to state a cause of action for the original obligations" under the contract. According to the trial court, Patrick Engineering did not, and could not, allege that the City authorized additional services under section 2 of the contract. Rather, "Patrick Engineering had to expend more hours than it expected to fulfill the contract. *** Additional work to fulfill the original scope of the contract is not an Additional Service ***. This is a risk that a party takes when it enters into a contract."

¶ 24    The trial court then turned to equitable estoppel. The court concluded that none of the municipal employees with whom Patrick Engineering dealt had authority to bypass the language of section 2 regarding additional services, and that Patrick Engineering knew of this restriction. According to the trial court, there was no affirmative act by the City, only unauthorized acts by its representatives. Thus, relying on *Nielsen-Massey Vanillas, Inc. v. City of Waukegan*, 276 Ill. App. 3d 146 (1995), the court held that equitable estoppel did not apply. Because Patrick Engineering's claims for breach of contract in counts I and II failed, so did its claim for an account stated in count IV.

¶ 25    Patrick Engineering, however, protested that count I sought recovery for work within the scope of the services, as well as work outside it. The trial court granted leave to file another amended complaint, setting out in a separate count a breach of contract claim for the work that Patrick Engineering contended had been performed within the scope of services. Patrick Engineering then filed a fourth amended complaint, which incorporated its third amended complaint in a footnote, presenting a new breach of contract claim. In this claim, Patrick Engineering sought only $219,086, slightly more than half the amount of the agreement. Because the City paid only $77,312.50, Patrick Engineering stated that it was due $141,773.80. The City filed another motion to dismiss, arguing that Patrick Engineering still had not specified the work it had done under the agreement. The trial court granted this

---

[5]In count III, Patrick Engineering presented a claim for recovery in *quantum meruit*, in the alternative to its claims for breach of contract. In count V, Patrick Engineering presented a claim under the Illinois Local Government Prompt Payment Act (50 ILCS 505/1 *et seq*. (West 2010)), which contained essentially the same allegations as count IV. These counts are not before us.

motion, and Patrick Engineering appealed.

¶ 26 The appellate court reversed and remanded. 2011 IL App (2d) 100695. Regarding counts I and II of Patrick Engineering's third amended complaint, the appellate court identified the issue as whether Patrick Engineering adequately alleged facts that could give rise to the application of equitable estoppel against the City. *Id.* ¶ 31. According to the appellate court, counts I and II could proceed:

> "Here, Patrick alleged that City officials, including the strategic services manager and the information technology team leader, told Patrick that it would be compensated for the extra work that it was performing once the pilot area data was accepted. The exhibits to the third amended complaint show the names of these persons, along with the technology project manager, on e-mails and letters to and from Patrick, raising the reasonable inference that they were involved in managing the project for the City. Patrick also alleged that the city manager, the chief procurement officer, and the city engineer all were aware of the extra work that Patrick was performing and that Patrick was performing that additional work at the direction of the City. Patrick stated that it relied on the statements of certain City agents and the apparent tacit agreement of others in deciding to perform the extra work, thereby incurring hundreds of thousands of dollars of extra expense. These allegations are sufficient to make out a claim of equitable estoppel." *Id.* ¶ 35.

¶ 27 The appellate court then addressed the City's argument that the acts of its employees could not provide the basis for equitable estoppel unless they had authority to modify the contract. *Id.* ¶ 36. The court stated that this argument would add another requirement to the doctrine of equitable estoppel, and the proposition that a plaintiff must plead the municipal agent had formal authority to act was "far from clear." *Id.* ¶ 40. The common thread in the caselaw, asserted the appellate court, is a rule that the plaintiff must plead the municipality "delegated (either expressly or impliedly) its authority in a particular area to the agent in question." *Id.* ¶ 43. The court again focused on Patrick Engineering's allegations "that persons who appear to have been designated by the corporate authorities to oversee the stormwater management project made representations to Patrick that induced it to perform the extra work." *Id.* According to the appellate court, the validity of these allegations would be tested in the litigation process, and counts I and II could survive a motion to dismiss. *Id.* ¶ 44.

¶ 28 Regarding count IV of the third amended complaint, the appellate court held that Patrick Engineering's claim for account stated did not present a freestanding claim against the City, but rather it served as a mechanism for ascertaining damages if the City was liable for Patrick Engineering's other claims. *Id.* ¶ 53. Because the court reversed the dismissal of those claims, it also reversed the dismissal of count IV. *Id.* ¶¶ 53-54.[6]

---

[6]The trial court dismissed Patrick Engineering's third and fourth amended complaints in full, and the appellate court reversed the dismissal of these complaints and remanded for further proceedings. The City has not appealed the appellate court's holding on counts III and V of the third amended complaint, or the breach of contract count in the fourth amended complaint. Those counts

¶ 29        This court allowed the City's petition for leave to appeal (see Ill. S. Ct. R. 315(a) (eff. Feb. 26, 2010)), and allowed the Illinois Road and Transportation Builders Association to file an *amicus curiae* brief in support of Patrick Engineering (see Ill. S. Ct. R. 345 (eff. Sept. 20, 2010)).

¶ 30                                    ANALYSIS

¶ 31        The City's motion to dismiss Patrick Engineering's third amended complaint was brought under section 2-619.1 of the Code of Civil Procedure, which allows a party to file a motion combining a section 2-619 motion to dismiss with a section 2-615 motion to dismiss. See 735 ILCS 5/2-619.1 (West 2010). A section 2-615 motion to dismiss tests the legal sufficiency of a complaint. *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81 (2004). A section 2-619 motion to dismiss admits the sufficiency of the complaint, but asserts a defense outside the complaint that defeats it. *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 12 (2005). Specifically, section 2-619(a)(9) permits involuntary dismissal where the claim is barred by "other affirmative matter." 735 ILCS 5/2-619(a)(9) (West 2010). When ruling on such motions, a court must accept as true all well-pleaded facts, as well as any reasonable inferences that may arise from them (*Doe v. Chicago Board of Education*, 213 Ill. 2d 19, 23-24 (2004)), but a court cannot accept as true mere conclusions unsupported by specific facts (*Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009)). See also *Hanks v. Cotler*, 2011 IL App (1st) 101088, ¶ 17 (stating that a motion to dismiss under sections 2-615 and 2-619 admits well-pleaded facts, but that "conclusions of law and conclusory factual allegations not supported by allegations of specific facts are not deemed admitted" (internal quotation marks omitted)). Our review of a dismissal under either section 2-615 or 2-619 is *de novo*. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006). We turn to the three counts before us.

¶ 32                          1. Counts I and II: Breach of Contract

¶ 33        In counts I and II of its third amended complaint, which were repleaded and incorporated into its fourth amended complaint, Patrick Engineering sought to recover $457,731.62 for its partial performance of services under the agreement, as well as its performance of additional services beyond the agreement.[7] Patrick Engineering tethered its breach of contract

_____

remain pending before the trial court.

        [7]According to the City, Patrick Engineering completed less than 25% of the project. According to Patrick Engineering's figures, that percentage may be higher.
        If $457,731.62, the total amount Patrick Engineering claimed in counts I and II of its third amended complaint, represents the amount of services that it performed both under and beyond the agreement, and $219,086, the amount Patrick Engineering claimed in the sole new count of its fourth amended complaint, represents the amount of services that it performed under the agreement, then seemingly it performed $238,645.62 in additional services and completed just over 50% of the project.
        However, we cannot determine whether those calculations are correct because, as the City

claims to the doctrine of equitable estoppel. Before us, the City raises four issues regarding counts I and II, but its initial and central contention is that a municipality may not be equitably estopped based upon the apparent authority of its employees. The City argues that the appellate court's decision departed from a long line of cases that uniformly require that a plaintiff seeking to impose equitable estoppel against a municipality must allege the municipal officials upon whose actions the plaintiff relied possessed actual authority.

¶ 34    "An agent's authority may be either actual or apparent, and actual authority may be either express or implied." *Zahl v. Krupa*, 365 Ill. App. 3d 653, 660 (2006). Express authority is actual authority granted explicitly by the principal to the agent; implied authority is actual authority proved circumstantially by evidence of the agent's position. *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 326 Ill. App. 3d 126, 135-37 (2001). Apparent authority, by contrast, is authority imposed by equity.

> "Apparent authority *** is the authority which the principal knowingly permits the agent to assume, or the authority which the principal holds the agent out as possessing. It is the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 523 (1993).

¶ 35    The doctrine of apparent authority is rooted in the doctrine of equitable estoppel. *Williams v. Ingalls Memorial Hospital*, 408 Ill. App. 3d 360, 370-71 (2011); accord *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 213 (1996). Indeed, our descriptions of them are congruent. Regarding apparent authority, we have stated that where a principal has created the appearance of authority in an agent, and another party has reasonably and detrimentally relied upon the agent's authority, the principal cannot deny it. See *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999). Regarding equitable estoppel, we have stated that where a person has said or done something, and another party has reasonably and detrimentally relied upon that statement or conduct, the person cannot deny it. See *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313 (2001). While these doctrines share certain considerations, Illinois courts have long held that equitable estoppel may apply against municipalities, in extraordinary and compelling circumstances (see, *e.g.*, *Village of Wadsworth v. Kerton*, 311 Ill. App. 3d 829, 837 (2000)), but have never held that apparent authority may apply against municipalities (see *D.S.A. Finance Corp. v. County of Cook*, 345 Ill. App. 3d 554, 563 (2003)).

¶ 36    The reason for this disparate treatment of these similar doctrines is twofold. First, apparent authority is rarely an issue in cases involving municipal officials because such officials are employees with some measure of actual authority. Second, and more

---

observes in its opening brief, Patrick Engineering "made no distinction in its invoices between services it claimed to have performed within the scope of the Contract, and additional services it claimed to have performed outside the scope of the Contract." We can safely assume that a significant portion of the work remained unfinished when this case began, and further that a significant portion of Patrick Engineering's putative damages were for additional services that the City never authorized in writing.

-12-

importantly, apparent authority is inappropriate in such cases. Because apparent authority is not actual, but only ostensible, an apparent agent may make representations the specifics of which the principal is unaware, and still bind the principal. *Lundberg v. Church Farm, Inc.*, 151 Ill. App. 3d 452, 461 (1986) ("an agent may bind his principal by acts which the principal has not given him *actual* authority to perform, but which he *appears* authorized to perform" (emphases in original)). "If the unauthorized acts of a governmental employee are allowed to bind a municipality ***, the municipality would remain helpless to correct errors" (*City of Chicago v. Unit One Corp.*, 218 Ill. App. 3d 242, 246 (1991)) or, worse, to escape the financial effects of frauds and thefts by unscrupulous public servants (*D.S.A. Finance Corp.*, 345 Ill. App. 3d at 563). Thus, we have required, "anyone dealing with a governmental body takes the risk of having accurately ascertained that he who purports to act for it stays within the bounds of his authority, and *** this is so even though the agent himself may have been unaware of the limitations on his authority." *Cities Service Oil Co. v. City of Des Plaines*, 21 Ill. 2d 157, 160-61 (1961); accord *Lindahl v. City of Des Plaines*, 210 Ill. App. 3d 281, 296 (1991) (holding that "knowledge of the limitations of [a municipality's] liability with respect to any contract which its officials attempt to enter into was imputed to plaintiff").

¶ 37      Here, the appellate court never mentioned apparent authority. Instead, the appellate court stated, "Patrick has alleged that persons who *appear* to have been *designated* by the corporate authorities to oversee the stormwater management project made representations to Patrick that induced it to perform the extra work." (Emphases added.) 2011 IL App (2d) 100695, ¶ 43. The word "appear" was perhaps inartful, but we choose to read it narrowly, in context with the words "designated" and "delegated." *Id.* ("A common thread in [the appellate court] cases is that the municipality's governing body delegated (either expressly or impliedly) its authority in a particular area to the agent in question."). The appellate court understood that equitable estoppel may apply against a municipality only based on statements and conduct by municipal officials who possess actual authority.

¶ 38      By focusing on the positions of various City officials, the appellate court seemed to hold that allegations of implied authority are sufficient. See *Progress Printing Corp. v. Jane Byrne Political Committee*, 235 Ill. App. 3d 292, 308 (1992) ("implied authority is that which is inherent in an agent's position"). According to the appellate court, the titles of Lang and Gunderson, as well as their names on exhibits attached to the complaint, "rais[ed] the reasonable inference that they were involved in managing the project for the City," and, consequently, their statements and conduct could form the basis of a colorable claim of equitable estoppel.[8] 2011 IL App (2d) 100695, ¶ 35. The appellate court, however, inferred too much and demanded too little, and ultimately erred in reversing the dismissal of counts I and II. The task of providing the parties and future litigants a template for determining what specific facts must be pleaded to support the application of equitable estoppel falls to us.

---

[8]The appellate court also mentioned Kresl—not by name, but by her title of "technology project manager"—as additional support for the inference that Lang and Gunderson managed the project. 2011 IL App (2d) 100695, ¶ 35. Obviously, Kresl's role in the City's bureaucracy had no bearing on the authority possessed by Lang and Gunderson.

-13-

¶ 39    Illinois courts have traditionally stated that, in order to apply equitable estoppel against a municipality, there must be an act by a municipality that induces reliance by a private party. See, *e.g.*, *County of Du Page v. K-Five Construction Corp.*, 267 Ill. App. 3d 266, 273 (1994); *Lindahl*, 210 Ill. App. 3d at 295; *Bank of Pawnee v. Joslin*, 166 Ill. App. 3d 927, 939 (1988). "[M]ere nonaction" is not enough. *Monarch Gas Co. v. Illinois Commerce Comm'n*, 51 Ill. App. 3d 892, 898 (1977) (citing *People ex rel. Petty v. Thomas*, 361 Ill. 448 (1935)). The act must be affirmative, but may be either an act by the municipality itself, such as legislation, or an act by an official with express authority to bind the municipality. See *Nielsen-Massey Vanillas, Inc.*, 276 Ill. App. 3d at 156 ("a city cannot be estopped by an act of its agent beyond the authority expressly conferred upon that official"); accord *Cities Service Oil Co.*, 21 Ill. 2d at 160. Additionally, the reliance must be detrimental and reasonable. That is, the private party must have not only substantially changed its position, based on the affirmative act of the municipality or its officials (see *id.* at 160-61), but also justifiably done so, based on its own inquiry into the municipal official's authority (see *D.S.A. Finance Corp.*, 345 Ill. App. 3d at 560).

¶ 40    These principles have emerged chiefly from cases resolved at advanced stages of litigation, but their import in the procedural posture of this case is clear. We hold that a plaintiff seeking to invoke equitable estoppel against a municipality must plead specific facts that show (1) an affirmative act by either the municipality itself or an official with express authority to bind the municipality; and (2) reasonable reliance upon that act by the plaintiff that induces the plaintiff to detrimentally change its position. Although agency (see *Athanas v. City of Lake Forest*, 276 Ill. App. 3d 48, 54 (1995)) and reliance (see *D.S.A. Finance Corp.*, 345 Ill. App. 3d at 560) are typically questions of fact, a plaintiff must offer more than mere conclusions on these elements because Illinois is a fact-pleading jurisdiction, and because, when public revenues are at stake, estoppel is particularly disfavored. *Halleck v. County of Cook*, 264 Ill. App. 3d 887, 893 (1994) (citing *Jack Bradley, Inc. v. Department of Employment Security*, 146 Ill. 2d 61, 81 (1991)); *County of Cook v. Patka*, 85 Ill. App. 3d 5, 13 (1980) ("The paramount consideration is the right of the people."). Without relaxing that requirement, we note that a plaintiff may be forced to present allegations of express authority upon information and belief. "[A]n allegation made on information and belief is not equivalent to an allegation of relevant fact" (*Whitley v. Frazier*, 21 Ill. 2d 292, 294 (1961)), but at the pleading stage a plaintiff will not have the benefit of discovery tools to expose details about a municipality's bureaucratic hierarchy. A plaintiff will have knowledge of what it did to learn those details, and should allege any efforts taken to determine the extent of the authority of the municipal official or officials involved. With this framework in mind, we examine the allegations in counts I and II.

¶ 41    Regarding the first element, Patrick Engineering's complaint is completely devoid of any allegations of agency, even upon information and belief. Patrick Engineering mentioned several officials, but asserted that only Lang and Gunderson made representations and assurances the City would issue a change order. Patrick Engineering stated that Gunderson was the City's information technology team leader and that Lang was the City's strategic services manager, as well as the manager of this project. But allegations that Lang and Gunderson possessed titles that appeared to confer upon them some undefined oversight

-14-

responsibility for the project are not a substitute for allegations that they possessed express authority to informally approve additional services.

¶ 42    Indeed, if any City official had such authority, it was more likely Kresl than Gunderson or Lang. Lang's letter referred to the City's assigned project manager, undercutting any implication that she herself filled that role, and listed Kresl as "Technology Project Manager." Blalock asked Kresl, not Lang or Gunderson, for a purchase order, and she told him that she was working to shepherd the agreement through the City's internal decisionmaking procedures and later working to identify preliminary choices for the pilot area. Blalock also responded to a request by Kresl, not Lang or Gunderson, to provide prices for additional services. In its oral argument, Patrick Engineering seemed to acknowledge that Kresl was the project representative, but in its complaint, it did not assert that or mention what steps it took to learn the identity of the project representative or the extent of that person's authority.[9] We conclude that Patrick Engineering failed to allege specific facts to show that any City official, including Lang and Gunderson, possessed express authority to ignore section 2.1 and verbally authorize additional services.

¶ 43    Regarding the second element, Patrick Engineering failed to allege specific facts that its reliance was reasonable. Patrick Engineering claimed, generally, that the City made various changes and additions to Patrick Engineering's work under the agreement, but did not identify which official or officials did so, much less what that official or officials may have said. According to Patrick Engineering, Dietzler's letter "outlined" the additional work, and may have shed light on who approved it, and what that official or officials approved, but the letter is not in the record. Its absence is telling. Patrick Engineering also never provided details about the statements made by Lang and Gunderson. As the City notes, Patrick Engineering stated that they made representations and assurances the City would issue a change order, but did not offer any details about the scope of such an order, leaving the vague implication that they sanctioned an unlimited measure of additional services and, in effect, an open draw on the City's treasury.

¶ 44    Further, as presented in Patrick Engineering's complaint, the statements made by Lang and Gunderson were all conditional. Patrick Engineering stated that Lang's letter made representations and assurances that "upon Patrick Engineering's delivery of the Pilot Area data, Naperville would work with Patrick to make necessary changes to the budget and project specifications." In fact, Lang wrote, "Upon delivery and review of the pilot data, the City will work with Patrick Engineering to determine *if* a change in scope to complete the remainder of Area B is required." (Emphasis added.) Lang also warned Patrick Engineering that until the pilot area data was accepted, "work performed in the remainder of Area B

_____

[9]In its brief, Patrick Engineering argues that its performance of additional services was induced, in part, by the conduct of Kresl, stating that it alleged Kresl, among other City officials "with oversight responsibility[,] made representations *** that price adjustments would be made to the Agreement and that change orders would issue." This statement is a blatant misrepresentation of the complaint. Patrick Engineering's complaint did not assert that Kresl made any assurances or representations whatsoever—and certainly none about the project's budget—or that she had express authority to do so.

-15-

without prior authorization from the city's assigned Project Manager is *at your own risk*." (Emphasis added.) The letter itself controls (see *Kehoe v. Saltarelli*, 337 Ill. App. 3d 669, 676 (2003)) and indicates that the purported assurances were far from sure. Patrick Engineering also stated that Lang and Gunderson informed its employees that the City would issue a change order "once the Pilot Area was accepted," but the pilot area data was never accepted.

¶ 45        Patrick Engineering attempts to divert our attention from these shortcomings by directing us to section 3.6 of the agreement, which provided that the City shall designate a project representative with "complete authority to transmit instructions, receive information, and interpret and define the City's policies and decisions." Patrick Engineering insists the City's breach of that section relieved Patrick Engineering of the duty to ascertain the limits of the authority possessed by various City officials until the parties engaged in discovery, thereby rendering its reliance upon the purported assurances from Lang and Gunderson more reasonable. But Patrick Engineering did not mention section 3.6 in its complaint, and regardless of whether the City violated it, the duty to ascertain the authority possessed by City officials remained with Patrick Engineering. See *Cities Service Oil Co.*, 21 Ill. 2d at 60-61; *Lindahl*, 210 Ill. App. 3d at 295; see also *Kerton*, 311 Ill. App. 3d at 839 ("The party seeking to claim the benefit of estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others."); *Levin v. Civil Service Comm'n*, 52 Ill. 2d 516, 524 (1972) ("the one claiming the benefit of [estoppel] must have relied upon the actions or representations of the other and must have had no knowledge or convenient means of knowing the true facts"). Patrick Engineering had an easy way to determine whether Lang and Gunderson could assent to a change order that was not authorized in writing by the City. Patrick Engineering could have followed the procedure set forth in section 2.1, submitted a written confirmation of any verbal requests for additional services, and waited for the City to authorize them in writing.

¶ 46        Patrick Engineering leans heavily on *Kenny Construction Co. v. Metropolitan Sanitary District*, 52 Ill. 2d 187 (1971), and *Stahelin v. Board of Education, School District No. 4*, 87 Ill. App. 2d 28 (1967), because, we assume, the holdings in those cases favored municipal contractors. Both are factually inapposite. In *Kenny Construction*, a construction company and a sanitary district entered into a contract to build a sewer tunnel. The contract included a clause regarding "changed conditions." This clause provided that if the company encountered changed conditions under the ground which materially differed from those shown on the project drawings or indicated in the project specifications and which could materially affect the cost of the project, the company was required to inform the district's chief engineer. The engineer would then investigate the conditions, and if he agreed that they differed and could affect the cost, he could approve in writing a modification to the contract. Such a modification then was subject to approval by the district's board of trustees.

¶ 47        The company encountered changed conditions, and asked the district to approve a modification that involved an alternative method of tunnelling using steel plates. The company president was told by the board president that he would speak to the chief engineer, and if that department agreed, the company would be compensated for any extra work. The company then met with the chief engineer, and they agreed on a price for the steel plates, but

-16-

did not agree on a cost for a modification. The chief engineer said that he would let the company proceed with the alternative method, but chose to defer any discussion regarding its cost because it would be more efficient to evaluate the work after it was completed and pay for it later. The chief engineer had employed this approach earlier, in response to another request by the company for a modification due to changed conditions. The company completed the work, but the district denied the company's claims for additional compensation. The company sued the district, and the trial court concluded that the district was equitably estopped from requiring that any modification to the contract must be approved in writing by the chief engineer and then approved by the board of trustees. The appellate court reversed the trial court's decision, and the company appealed.

¶ 48　　This court reversed the appellate court's decision. We held that the chief engineer's statements constituted an undertaking to pay for extra work after it was completed. *Kenny Construction*, 52 Ill. 2d at 197. We stated that the company relied upon the chief engineer's statements to its detriment, so the district was estopped from seeking to avoid liability because the engineer had not approved the modification in writing. *Id.* Additionally, we stated that the contract was ambiguous regarding board approval, and the procedure that the parties followed when they agreed on a price for the steel plates indicated that the chief engineer had obtained board approval to determine the cost of the alternative method, and any additional compensation, after the work was completed. *Id.* at 198-99. However, our holding was "predicated on the particular wording of this contract and no general principles relating to the principal-agent relationship should be drawn from it." *Id.* at 199.

¶ 49　　In *Stahelin*, a construction contractor and a school district entered into a contract to build a school. Under the contract, the project's architect assumed control and supervision of the project and had the power to make reasonable deviations to the plans and determine whether to pay the contractor for any additional work. The contract provided, however, that no "extras" would be allowed unless they were ordered in writing by the architect. The architect changed the plans several times and instructed the contractor to keep a record of any extras, and compensation for them would be determined at the end of the project. The contractor encountered problems with the new plans and incurred increased costs. When the school district refused to pay for extras, the company sought a declaratory judgment that the district was liable for the extras. The trial court entered judgment for the contractor, and the district appealed.

¶ 50　　The appellate court affirmed the trial court's decision. The court held that the contract provision requiring the architect to order in writing any extras was for the school district's benefit, but the district had waived compliance with it because it was aware the contractor was performing additional work. *Stahelin*, 87 Ill. App. 2d at 37-38. In fact, the district even directed the contractor to take instructions from the architect. *Id.* at 38. Further, "[t]he evidence established that the [district] had knowledge that it was intended that the amount of the extras *** was to be adjudicated upon the completion of the work." *Id.* at 42. The appellate court's holding, like our holding in *Kenny Construction*, depended upon "the circumstances of this case and the contract provisions in question." *Id.*

¶ 51　　Thus, *Kenny Construction* and *Stahelin* are only instructive for the proposition that municipal contracts are each different, and the legal effect of each one depends upon its

language and the parties' conduct in light of that language. Like the contracts in *Kenny Construction* and *Stahelin*, the agreement here contained a provision about additional services, but unlike the contracts in those cases, the agreement here did not identify a municipal official who could approve those services. Additionally, unlike the officials in *Kenny Construction* and *Stahelin*, City employees here never agreed that compensation for additional services would be discussed and determined upon completion of the project, at least according to the allegations in Patrick Engineering's complaint.

¶ 52     As the City observes in its opening brief, the agreement was "designed to avoid the very situation" before us now. The parties contemplated that the need for additional services could arise and, in order to protect both their interests, inserted a provision into the agreement to govern verbal requests by the City for such services. Patrick Engineering chose to neglect that provision. Accordingly, we conclude that Patrick Engineering failed to allege specific facts to show its reliance on the conditional representations and assurances made by Lang and Gunderson was reasonable. Because Patrick Engineering's complaint does not contain specific facts to support the application of equitable estoppel here, we affirm the decision of the trial court dismissing counts I and II.

¶ 53                               2. Count IV: Account Stated

¶ 54     In count IV of its third amended complaint, Patrick Engineering sought to recover $341,857.96 on the theory that its invoices, to which the City did not object, created an account stated. Initially, we note that there are puzzling, and troubling, discrepancies in Patrick Engineering's figures. Simply put, from the beginning of this litigation, the amount of damages that Patrick Engineering has claimed on this theory do not relate in any discernable way to the amount of the agreement, $436,392, or the amount of its invoices, $436,382.83. Additionally, the amount that Patrick Engineering claimed it invoiced in count IV was $419,170.16, and the amount that it claimed it invoiced in its response brief was $457,731.62, the same amount as the damages it claimed in count I of its original complaint and counts I and II of its third amended complaint.

¶ 55     Further, as we noted, Patrick Engineering misstated the amount of the third invoice. In count IV Patrick Engineering alleged that in "late February or early March, 2008," it hand-delivered to the City an invoice in the amount of $242,020, but the third invoice billed the City $259,232.67. And the forms of the invoices themselves are slightly different. The third invoice listed an outstanding balance of $78,177.30 from the second invoice, so apparently the City paid part of the second invoice (or perhaps part of the first and second invoices), but the invoices never indicate how much the City paid. The fourth invoice listed an outstanding balance of $337,409.97, which represented the outstanding balance from the second invoice plus the amount of the third invoice. The fifth invoice listed the same outstanding balance as the fourth invoice, but did not include the amount of the fourth invoice, or give the City a total amount that remained unpaid. And the third and fourth invoices are the only ones that mention the billing limits of the project, as if Patrick Engineering wanted to alert the City that slightly less than a year after the parties signed the agreement, Patrick Engineering already had billed $402,468.77, or 92% of the $436,392 contract amount. The question is

-18-

whether Patrick Engineering alleged specific facts to state a claim for an account stated.

¶ 56    "An account stated has been defined as an agreement between parties who have had previous transactions that the account representing those transactions is true and that the balance stated is correct, together with a promise, express or implied, for the payment of such balance." *W.E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.*, 132 Ill. App. 3d 260, 267 (1985). Further, "an account stated cannot be created merely by furnishing an account unless the creditor or debtor specifically intends to establish a balance due or to agree upon a final settlement to date between the parties." *Toth v. Mansell*, 207 Ill. App. 3d 665, 672 (1990). That is, an account stated is "merely a final determination of the amount of an existing debt," and an action for an account stated is founded upon a promise to pay that debt, not the original promise to pay under the contract. *Motive Parts Co. of America, Inc. v. Robinson*, 53 Ill. App. 3d 935, 941 (1977).

¶ 57    Because of the discrepancy between the amounts allegedly billed and the amounts actually billed, count IV does not present a true and correct statement of the account between the parties. Additionally, because the fifth and final invoice never provided to the City a final statement of account, indicating the total amount owed by the City, count IV does not, and cannot, allege that the City promised to pay that amount. Although count IV contains an allegation that the City never objected to the five invoices, and consequently the City acknowledged their correctness, count I contains allegations that the City "failed to approve the invoices" and "failed and refused to pay" for Patrick Engineering's services. The City never acquiesced to the invoices; there was simply no meeting of the minds. We affirm the trial court's decision to dismiss count IV.

¶ 58                                    CONCLUSION

¶ 59    For the reasons that we have stated, we reverse the judgment of the appellate court, affirm the judgment of the circuit court, and remand the cause to the circuit court for further proceedings.

¶ 60    Appellate court judgment reversed.

¶ 61    Circuit court judgment affirmed.

¶ 62    Cause remanded.